**John S. TRINSEY, Jr.**

v.

**COMMONWEALTH OF PENNSYLVANIA, Department of State, Board of Elections, the Governor, Secretary of the Commonwealth, Arlen Specter, Anne Anstine, William H. Lamb, Elsie Hillman, Herbert Barness, the Republican State Committee of Pennsylvania, Intervenors in DC,**

**Pennsylvania Democratic State Committee, Lawrence J. Yatch, William K. Myrtetus, Don Walko, Billie Jo Herr and Anthony J. May, Intervenors,**

**Intervenors, Senator Arlen Specter, Anne Anstine, William H. Lamb, Elsie Hillman, Herbert Barness, and the Republican Committee of Pennsylvania, Appellants in No. 91–1490,**

**Department of State of the Commonwealth of Pennsylvania, Governor Casey and Commonwealth Secretary Christopher A. Lewis, Appellants in No. 91–1491.**

Nos. 91–1490, 91–1491.

United States Court of Appeals, Third Circuit.

Argued July 15, 1991.

Decided Aug. 6, 1991.

Karen M. Balaban, Joseph C. Kohn, Harrisburg, Pa., for intervenors, Pennsylvania Democratic State Committee, Lawrence J. Yatch, William K. Myrtetus, Don Walko, Billie Joe Herr and Anthony J. May.

Thomas A. Allen, Gale White (Frederick L. Voigt, Hal Fichandler, of counsel), White and Williams, Philadelphia, Pa., amicus curiae, The Committee of Seventy.

John S. Trinsey, Jr., pro se.

Laura E. Little (argued), Philadelphia, Pa., amicus curiae appointed by the court.

Before SLOVITER, Chief Judge, GREENBERG and SEITZ, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Chief Judge.

I.

*Facts and Procedural History*

John Heinz, a United States Senator from Pennsylvania, died on April 4, 1991 in an airplane accident. A Pennsylvania statute, 25 Pa.Stat.Ann. § 2776 (Purdon 1991), sets forth the procedure which should be applied to fill a senatorial vacancy. That statute provides, *inter alia*, that the Senator's unexpired term is to be filled by a special election to be held at the time of the next general or municipal election occurring at least 90 days after the happening of the vacancy. The Governor is obliged to issue writs of election within 10 days after the vacancy happens.

The statutory provision of principal relevance to the issues in this appeal provides: "Candidates to fill vacancies in the office of United States Senator shall be nominated by political parties, in accordance with the party rules relating to the filling of vacancies, by means of nomination certificates" to be filed at least 60 days prior to the special election. *Id.* The "political parties" who are entitled to nominate their candidates in this manner are those whose candidate for any office in the last general election received at least two percent statewide and two percent in at least ten counties of the largest vote cast in the state for

Ernest D. Preate, Jr. (argued), Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Gwendolyn T. Mosley, Sr. Deputy Atty. Gen., Jerome T. Foerster, Deputy Atty. Gen., Office of Atty. Gen., Harrisburg, Pa., for appellant, Com. of Pa.

Gregory E. Dunlap (argued), Ernest R. Closser III, Deputy Gen. Counsel, James J. Haggerty, Gen. Counsel, Richard D. Spiegelman, Executive Deputy Gen. Counsel, Office of Gen. Counsel, Harrisburg, Pa., for appellants, Governor Robert P. Casey, Secretary of the Commonwealth Christopher A. Lewis, and The Dept. of State of the Com. of Pa.

Mark A. Klugheit (argued), Martin J. Black, Abigail R. Simkus, Laura Aldir-Hernandez, Dechert Price & Rhoads, Arlen Specter (argued), Philadelphia, Pa., for intervenors-appellants, Arlen Specter, William H. Lamb, Elsie Hillman, and Herbert Barness.

William M. Doran, Thomas B. Kenworthy, Andrew D. Leipold, Morgan, Lewis & Bockius, Philadelphia, Pa., for intervenors-appellants, The Republican State Committee of Pennsylvania and Anne B. Anstine.

any elected candidate. *Id.* § 2831(a). The Democratic and Republican parties are the only parties which fit this definition at least at this time. Individuals or candidates of other political parties must satisfy the state's requirements as to nomination papers in order to appear on the ballot for the special election. *Id.* § 2911(a)–(d). Section 2776 provides that the Governor may make a temporary appointment to fill the vacancy until the special election.[1]

In accordance with that statute, the Governor of Pennsylvania, Robert P. Casey, issued a writ of election declaring a special election for November 5, 1991; on May 13, 1991, Governor Casey named Harris Wofford as a temporary appointment to fill the senatorial vacancy.

On April 29, 1991, John S. Trinsey, Jr. filed a complaint in the United States District Court for the Eastern District of Pennsylvania, alleging that he wishes to become a candidate to fill the vacancy caused by Senator Heinz's death, and asserting that section 2776 violates the Fourteenth[2] and the Seventeenth Amendments of the United States Constitution because it authorizes nominations of candidates to fill senate vacancies by political parties rather than by primary elections. He sought a declaration that section 2776 is unconstitutional. By motion, he sought injunctive relief directing that he and others be placed on the ballot at the November election, and that Wofford be restrained from serving as Senator and that the appointment be set aside. The defendants, the Commonwealth of Pennsylvania, the Department of State, Board of Elections, the Governor, and the Secretary of the Commonwealth, opposed Trinsey's request for preliminary relief and moved, *inter alia,* to dismiss the complaint for failure to state a claim and as barred by the Eleventh Amendment, U.S. Const. amend. XI.

The district court scheduled a hearing on the motion for preliminary injunction on May 29, 1991. No party offered evidence and instead the parties presented oral argument. Following supplemental submissions on legal issues requested by the district court, the court denied both Trinsey's request for preliminary injunction and the defendants' motion to dismiss. It issued a final judgment on the merits declaring section 2776 to be unconstitutional, essentially on the ground that the statute violates the Seventeenth Amendment, U.S. Const. amend. XVII, because it does not provide for a primary election before the special election to fill a Senatorial vacancy.

The Commonwealth defendants appealed, as did Pennsylvania Senator Arlen Specter who, together with Republican Party officials and the Republican State Committee of Pennsylvania, had been given leave to intervene by the district court. On appeal, we granted leave to the Pennsylvania Democratic State Committee and its officials to intervene, and granted leave to the Committee of Seventy to file a brief amicus curiae. Because appellee Trinsey is ap-

---

1. The full text of 25 Pa.Stat.Ann. § 2776, reads as follows:

> Whenever a vacancy shall occur in the office of United States Senator, said vacancy shall be filled for the unexpired term by the vote of the electors of the State at a special election to be held at the time of the next general or municipal election, occurring at least ninety (90) days after the happening of such vacancy, and it shall be the duty of the Governor to issue writs of election to the various county boards of elections and to the Secretary of the Commonwealth within ten (10) days after the happening of said vacancy. Candidates to fill vacancies in the office of United States Senator shall be nominated by political parties, in accordance with the party rules relating to the filling of vacancies, by means of nomination certificates, in the form prescribed in section 630 of this act; and by

political bodies, by means of nomination papers in accordance with the provisions of sections 951, 952 and 954 of this act. Said nomination certificates and nomination papers shall be filed in the office of the Secretary of the Commonwealth at least sixty (60) days prior to the date of said special election. Until such time as said vacancy shall be filled by an election as herein provided, the Governor of the Commonwealth may make a temporary appointment to fill said vacancy.

2. The complaint actually alleged violation of the Fifteenth Amendment, U.S. Const. amend. XV, but on oral argument before us Trinsey explained that he intended to refer to the Fourteenth Amendment, U.S. Const. amend. XIV, and we will so treat his complaint, as did the district court.

pearing *pro se* and is not an attorney, it appeared to the court that the interests of informed decisionmaking required that the position adverse to that of appellants be fully and forcefully advanced, and we entered an order appointing Professor Laura E. Little as amicus curiae to present an appropriate response to appellants' position.[3] We expedited the appeal.

## II.

### *The District Court Opinion*

The district court's analysis began with the undisputable proposition that the constitutional right of the citizens of Pennsylvania to vote for their national representatives has its foundation in the Qualifications Clauses contained in Article I of the Constitution, U.S. Const. art. I, § 2, cl. 2, and the Seventeenth Amendment. The Qualifications Clause of Article I applies only to the election of members of the House of Representatives [4] and thus is inapplicable here. Instead, we are concerned with the Seventeenth Amendment, which contains provisions, including the Qualifications Clause applicable to election of Senators, which were designed to replace the original constitutional provision for election of United States Senators by state legislatures [5] with a provision requiring popular election of Senators.

The district court analyzed the legislative history of the Seventeenth Amendment and numerous federal cases arising under the First, Fourteenth and Fifteenth Amendments. The district court stated that "the [Supreme] Court has recognized that the Constitution guarantees the franchise at all stages of the electoral process, including the nomination stage." Typescript Op. at 9. The court noted that the right to vote is fundamental and is protected against private as well as state interference. The court recognized, however, that the issue whether the right to vote must be protected at the nomination stage has not been squarely presented before. Indeed, it concluded from the Supreme Court precedent that "[i]t is clear that the states could choose to run general elections [without] the prior selection of major political party nominees by primary or otherwise." *Id.* at 6 (citing *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 218, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986)). Nonetheless, it held that "precedent requires popular participation at the nomination stage" preceding a special election to fill a Senatorial vacancy, apparently because Pennsylvania had chosen to use the primary system for selection of nominees by political parties in its general elections. *Id.* at 13.

Having thus determined that Pennsylvania's statute, section 2776, infringes upon the fundamental right to vote, the court applied strict scrutiny review under which the statute could be upheld only if the Commonwealth showed that it advances a compelling state interest and is narrowly tailored to serve that interest. The Commonwealth proffered four state interests: limiting the names on the ballot, guarding against splintered parties and an unstable political system, preventing clogging of the election mechanism, and shortening the length of service of a non-elected Senator. The court held that the first three cannot justify the statute because they would apply equally in general elections, for which Pennsylvania does provide a primary. The court recognized that at least the last of the state interests proffered had some merit, but it concluded that Pennsylvania's system was not narrowly tailored to serve that interest.

---

**3.** The court expresses its appreciation to Professor Little for undertaking to provide her assistance and particularly for doing so within the severe time restraints imposed by our scheduling order.

**4.** Article I, § 2, cl. 1 of the United States Constitution provides:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

**5.** The Constitution originally provided that the two Senators from each state were to be "chosen by the Legislature thereof." U.S. Const. art. I, § 3, cl. 1.

Finally, the district court reviewed the vacancy proviso of the Seventeenth Amendment authorizing the state legislature to empower the executive to make temporary appointments to fill the senatorial vacancy until the special election but reasoned that this proviso did not authorize the state legislature to commit what the court had already determined to be unconstitutional, *i.e.,* to permit the nominations for candidates to fill senatorial vacancies without conducting a popular primary. The court found it significant that the vacancy proviso specifies that "the people" must elect the new Senator. U.S. Const. amend. XVII.

The court concluded that although the Governor's temporary appointment of Senator Wofford is constitutional and that Trinsey could not be included as an independent candidate in the special election without meeting Pennsylvania's requirements for third-party candidates, section 2776 violates the Seventeenth and Fourteenth Amendments.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (1988). This court has jurisdiction over the appeal from the final decision of the district court issuing a declaratory judgment pursuant to 28 U.S.C. § 1291 (1988). The issue before us is one of law and our review is plenary.

### III.

#### *Discussion*

#### A. The Seventeenth Amendment

Although the appellants, intervenors and amici curiae opposing the decision of the district court (referred to jointly as appellants) have filed numerous briefs, their principal position does not differ. Essentially, they argue that the district court erred in interpreting the Supreme Court precedent and the legislative history of the Seventeenth Amendment to hold that the Constitution requires Pennsylvania to hold a primary election to select candidates to fill an unanticipated vacancy in the office of United States Senator.

The district court relied primarily on the Seventeenth Amendment. The language it-self, as the district court acknowledged, contains no reference to a primary election. The Seventeenth Amendment to the Constitution provides in relevant part that:

> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

Notwithstanding the lack of language referring to a primary, the district court discerned from the legislative history of the Seventeenth Amendment a congressional intent to treat "nomination as a part of the general electoral process," Typescript Op. at 8, and it was therefore "reluctant to hold that the framers of the Seventeenth Amendment were authorizing major political parties to choose their nominees without an election." *Id.* at 9. We do not believe the legislative history supports the construction placed upon it by the district court.

It must be remembered that under the original Constitution, the responsibility for selecting United States Senators was placed upon the state legislators. This proved to be a controversial provision. There were numerous attempts to change the method of selection, but they were aborted by the Senate until 1911 when the Senate's earlier hostility or indifference to a constitutional amendment was finally overcome. Among the reasons given for that chamber's change of heart were the increasing clamor of the overburdened state legislatures for the call of a constitutional convention to change the method of

senatorial selection [6] and the receptivity to direct election by the growing number of United States Senators who themselves had been selected through some form of popular vote. *See* 1 G. Haynes, *The Senate of the United States* 106–08 (1960) (Haynes).

The district court placed great emphasis on the following paragraph from the Senate Report accompanying Senate Joint Resolution 134, the bill which was ultimately enacted as the Seventeenth Amendment:

It should not be overlooked either that the election of Senators by popular vote would not only leave *the nomination and election* of the members of the legislature upon the simple issue of their fitness for that particular work, but it would place every candidate for the high place of Senator before the people, where his views and his relationship to the public interests of the State could be known and understood of all.

S.Rep. No. 961, 61st Cong., 3d Sess., 14 (1911) (emphasis added by the district court, Op. at 1342–43).

The court interpreted this paragraph as demonstrating a legislative intent that the popular election requirement of the Seventeenth Amendment would apply to both the election *and the nomination* of United States Senators. When read in the context of the preceding discussion in the Senate Report, it seems clear that the reference to "the nomination and election of the members of the legislature" is not to the nomination and election of United States Senators, but to the nomination and election of the members of the *state legislature.*

The preceding four paragraphs of the Senate Report discuss what appears to be one of the key reasons for the passage of the Seventeenth Amendment: the need to remove from the state legislatures the burden of selecting United States Senators, a process each state legislature had to undergo at least twice every six years.

The focus on that concern is evident from the following passage which appears

in the Senate Report shortly before the one the district court quoted:

It is believed that one of the great advantages to be gained by a change of the mode of electing Senators is that of leaving the State legislatures free and unembarrassed to attend to that legislation which the interests of the State require. It is frequently true that a senatorial election not only pushes aside all matters of local interest, in so far as the election of members to the legislature is concerned, but that it also occupies not only weeks, but sometimes months, or the entire session of the legislature, to the great detriment of the State's public business. Not only is legislation which ought to be had not had, public interests which ought to be cared for are not cared for, but charges of bribery arise and scandal attaches to the entire lawmaking department of the State.

*Id.* at 13.

Thus, the subsequent language in the Senate Report which was quoted by the district court, interpreted in this context, is that the popular election of United States Senators will "leave the nomination and election of members of the [state] legislature upon the simple issue of their fitness for that particular work [, *i.e.,* the enactment of state laws]," rather than upon the issue of their fitness for selecting a United States Senator.

The need to relieve the state legislatures of the burden of selecting United States Senators is reiterated throughout the floor debates. The Senators addressing the issue during the floor debates discussed three problems: (1) the selection of state legislators on the basis of their ability to fill seats in the United States Senate instead of their ability to enact state laws; (2) the diversion of the state legislatures' attention away from addressing the problems of their states; and (3) political corruption. *See* 46 Cong.Rec. 1104–05 (1911) (remarks of Sen. Borah); *id.* at 2256 (remarks of Sen. Beveridge).

---

**6.** The difficulties attendant upon the state legislature's selection of Senators are graphically set forth in R. Byrd, The Senate, 1789–1989, S.Doc. No. 100–20, 100th Cong., 1st Sess. 390–98 (1988) (Byrd).

It is true that there were several references made during the floor debates to the use of primary elections to achieve party nominations for the United States Senate. The district court referred to the statement by Senator McCumber that "[c]oincident, if not preceding this change of election of United States Senators, will be the nomination of senators by popular vote." That this was intended as a prediction of what might happen rather than a statement of what must happen is evidenced by Senator McCumber's next sentence: "This means *in most instances* a double campaign, first fought to a finish between the candidates of a particular party, and then between the successful candidates of opposing political parties." 47 Cong.Rec. 1881 (1911) (emphasis added). The references to primaries in the debates appear to be merely observations based on the then current trend toward the enactment of primary laws. *See id.* at 1886 (remarks of Sen. Borah); 46 Cong.Rec. 2257 (remarks of Sens. Owen and Beveridge); *id.* at 2259 (remarks of Sen. Beveridge).

The remarks of Senator Borah merit particular attention because he was the author of the Senate Report. In arguing against an amendment that would have enabled Congress to prescribe the electoral practices of the states, Senator Borah made clear that he believed that the precise mode of senatorial nomination and election was to be a purely local question and that establishment of a primary system was to be left to the states. He stated:

> [P]opular elections have come peculiarly to be matters of local arrangement. The manner of holding them has become essentially local. The trend of events and the logic of conditions have made them local. Each State has its primary or is coming to have....

> ... We will have intrusted to the State the sole power to determine, outside of the rule against discrimination, who shall vote for a Senator. We will have intrusted to the State to determine what kind of a man shall be sent here, save as to his age and citizenship. We will have intrusted to the people the power to directly choose Senators, and, sir, we will have intrusted to the voluntary action of the people of the State the sole power to determine whether they will elect a Senator at all.... Yet, after intrusting to the States and the people of the States all these substantial powers, we say they may nevertheless prove unfit to determine the manner of doing this; *that they may not be wise enough to say whether they want nominations by primary or by open conventions;* whether they want the Australian ballot or the open ballot; whether they want protected booths or unprotected booths.

47 Cong.Rec. 1886 (emphasis added).

There is no doubt that there was some sentiment among certain Senators in favor of primaries as the preferred method for nomination of senatorial candidates in order to counter what almost all of the Senators participating in the debate saw as the evils of party politics and the corrupting influence party bosses, caucuses, machine politicians, and ward heelers had on politics in general and senatorial elections in particular. Although some Senators opined that passage of the Seventeenth Amendment would bring the end of machine politics, 47 Cong.Rec. 1921–22 (remarks of Sen. Owen); *id.* at 1882 (remarks of Sen. McCumber); 46 Cong.Rec. 1106 (remarks of Sen. Borah), there is no firm evidence that they believed that they were tackling the political machines by mandating primaries as well as direct election of Senators.[7]

---

7. The strongest statement, and it is hardly strong enough support for the district court's conclusion, was that of Senator Beveridge who attributed voter apathy to party control over nominations:

> So it comes to be said, and that, too, by intelligent people—and I am coming to the intelligence of the masses in a minute—"What is the use? The caucus fixes who is to be nominated; conventions, run by bosses, say who is to be nominated by both parties; I can not vote for whom I like; it will have no influence with the laws." That is the reason, Mr. President, why the people's voting is falling off.

> But where the people understand that they themselves can take part in legislation; that they themselves can vote for a Senator, for example; that they themselves under that system, which started in older countries than

Moreover, we should not overlook help gleaned from the debate on the Seventeenth Amendment in the House of Representatives. Particularly significant is the statement of Rep. Lenroot from Wisconsin who, in speaking against deletion of the clause in Article I, § 4 giving Congress the right to regulate national elections, commented that Congress might some day pass a law which guarantees to the people of every state "the right to nominate as well as elect." 47 Cong.Rec. 223 (1911).

Although we cannot find support in the legislative history of the Seventeenth Amendment for the district court's holding that it was intended to mandate primaries as well as the popular election of Senators, our inquiry need not be cast so broadly. The issue before us is limited to whether a primary is required to nominate a candidate to fill a senatorial vacancy. Senatorial vacancies are the province of the second paragraph of the Amendment, whereas the first paragraph deals with regular elections of Senators. It is surprising that there does not appear to have been any discussion in the floor debates as to how mid-term vacancies should be filled. Accordingly, even if there could be some legislative intent gleaned from the legislative history as to the necessity of primaries in a regular general election, we are given no guidance of the legislative intent as to the course to be followed in the present circumstance. It follows we must pursue other courses for guidance.

## B. The Supreme Court Precedent

The district court's holding that the Seventeenth Amendment requires the popular election of party nominees rested not only on excerpts from the legislative history but also on its reading of two Supreme Court cases, *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941),

and *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). The district court's opinion suggests that *Classic* and *Tashjian* establish the proposition that the right to nominate candidates through primaries, like the right to vote in a general election, is a right secured by the Constitution. We read those cases differently.

In *Classic*, Louisiana election officials charged with willfully altering and falsely counting and certifying the ballots of voters cast in a primary election for a Representative to Congress were indicted under a federal criminal statute making it a crime to interfere with or deprive any citizen of any right or privilege secured by the Constitution. The defendants argued that the right to vote in a primary was not a right secured by the Constitution. The Court assumed that in adopting Article I, § 2, which provides that members of the House of Representatives shall be "chosen ... by the People," U.S. Const. Art. I, § 2, cl. 1, the framers of the Constitution did not have specifically in mind selection by a direct primary. Nonetheless, it rejected the defendants' argument, holding instead that the right to have one's "vote counted in both the general election and in the primary election, where the latter is a part of the election machinery," is a right protected by the Constitution. 313 U.S. at 322, 61 S.Ct. at 1041. Nothing in *Classic* suggests that the Constitution requires the holding of primaries in the election of representatives. Instead, the Court emphasized that the Constitution gave the states "wide discretion in the formulation of a system" for electing representatives. *Id.* at 311, 61 S.Ct. at 1035.

The language of the opinion makes it clear that it was holding merely that if primaries are a part of the selection process they cannot be conducted in a manner

---

ours, can cast their vote upon a specific law, I observe that history shows that they come to the polls in greater abundance. Mr. President, if you want to encourage the negligence of the great privilege and duty of voting by the people just continue to take away from them more of their participation in government.

46 Cong.Rec. 2257. Even Senator Beveridge, however, spoke of the future to be ushered in by the Seventeenth Amendment in terms of the people's "vote for a Senator," which is fully consistent with a construction of the Seventeenth Amendment as limited to the election, rather than nomination, of Senators.

inconsistent with the popular election mandate of the Constitution:

> Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted *at the primary* is likewise included in the right protected by Article I, § 2.

*Id.* at 319, 61 S.Ct. at 1039 (emphasis added).

We reach a similar conclusion about *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), upon which the district court relied heavily. The Republican Party in Connecticut, which had adopted a rule which permitted independent voters to vote in Republican Party primaries for statewide and federal offices, challenged a Connecticut election law that required voters in primaries to be registered members of that party. The Supreme Court held the state law violated the Republican Party's First Amendment rights. In so holding, the Court rejected Connecticut's argument that the Party rule would violate the Qualifications Clauses contained in Article I, § 2 and the Seventeenth Amendment because it would allow persons to vote in the primaries for the federal offices who were not eligible to vote in the primaries for the most numerous branch of the state legislature. *See* U.S. Const. Art. I, § 2, cl. 1; U.S. Const. amend. XVII. There was no provision in the Party rule for independents to vote in the primaries for those offices.

Although the Court ultimately held that the fundamental purpose of the Qualifications Clauses is satisfied if all of those qualified to participate in the selection of members of the more numerous branch of the state legislature are also qualified to participate in the election of United States Senators and Representatives, 479 U.S. at 229, 107 S.Ct. at 556, the district court seized upon the language the Court used before reaching that conclusion. The Court, in rejecting the Republican Party's argument that primaries were not subject to the Qualifications Clauses, stated that the fundamental purpose underlying the Qualifications Clauses "applies to the entire process by which federal legislators are chosen." *Id.* at 227, 107 S.Ct. at 555. After noting that *Classic* had held the Qualifications Clauses apply to primaries as well as to general elections "where the state law has made the primary an integral part of the procedure of choice," the Court stated, "[t]he constitutional goal of assuring that the Members of Congress are chosen by the people can only be secured if that principle is applicable to every stage in the selection process." *Id.* 479 U.S. at 227, 107 S.Ct. at 555. The district court relied on this "every stage in the selection process" language in finding that party nomination of candidates authorized by section 2776, a stage in the selection process, violates the popular election mandate of the Seventeenth Amendment.

*Tashjian,* like *Classic,* cannot support the district court's holding. It is clear from the context of the Supreme Court's "every stage" statement in *Tashjian* that it was referring to the holding of primary elections when one was required under state law. The statement which is at the heart of the district court's holding, put in its proper light, presupposes the holding of a primary. For the same reason, the district court's reference to the *White Primary Cases (Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927)) adds no additional authority because those cases, like *Tashjian* and *Classic,* are directed to the enforcement of constitutional norms in primary elections provided by state law rather than to the wholly distinct question whether the primary itself is mandated by constitutional law.

A more fundamental problem with the district court's reliance on *Tashjian* and *Classic* is that those cases involved regular general elections, whereas section 2776 is concerned only with the special election of a successor to a vacancy in a Senate seat. The Seventeenth Amendment explicitly provides that "the legislature of any State

may empower the executive thereof to make temporary appointments until the people fill the vacancies by election *as the legislature may direct.*" (emphasis added). This vacancy proviso of the Amendment has been found to confer "a reasonable discretion upon the states concerning the timing and manner of conducting vacancy elections." *Valenti v. Rockefeller*, 292 F.Supp. 851, 866 (S.D.N.Y.1968), *aff'd*, 393 U.S. 404, 405, 406, 89 S.Ct. 689, 693, 21 L.Ed.2d 635, 636 (1969).

In *Valenti*, New York voters challenged the provision of the state election law that Senate vacancies which arise less than 60 days before the regular spring primary be filled at the general election in the next even-numbered year. As a result of the timing of Senator Robert Kennedy's death, the interim appointee selected by the Governor of New York to fill the Senate vacancy would serve some 29 months. The plaintiffs argued that the Seventeenth Amendment gave authority for the Governor to make a temporary appointment as successor only until the vacancy can be filled by the people at the next regularly scheduled election, two years earlier than under state law.

The three-judge court in *Valenti*, summarily affirmed by the Supreme Court, rejected plaintiffs' argument that the Seventeenth Amendment compelled New York to adopt plaintiffs' proffered timetable for filling a Senate seat vacancy. Instead, the court held that the "natural reading" of the vacancy provision of the Seventeenth Amendment "grants to the states some reasonable degree of discretion concerning both the timing of vacancy elections and the procedures to be used in selecting candidates for such elections." *Id.* at 856. The court found that New York's election procedure furthered substantial state interests and was thus not an abuse of the discretion granted to the states by the Amendment. The interests included, *inter alia*, the state's belief that voter interest and turnout is greater in "even-numbered years" when congressional elections are held. *Id.* at 859.

*Valenti* represents the converse of the situation before us, but the court's analysis is fully applicable here. An election under the *Valenti* plaintiffs' timetable would have required the nominees for the vacancy to miss a primary and to have been selected by the committees of the political parties. *Id.* at 862. The court characterized "[t]he choice" as being "between securing a prompt decision by the people between the nominated candidates, and delaying that decision in order for the people to participate directly in the nominating process." *Id.* at 862. The court held that "the drafters and ratifiers of the Seventeenth Amendment believed[] that this type of choice between election procedures is best left to the discretion of the states when there are substantial interests which will be served by either alternative." *Id.*

The discretion conferred upon states in developing the procedure for filling a vacancy was also discussed in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), in which the Court held that a Puerto Rico statute which authorized a vacancy in the Puerto Rico legislature to be filled by the political party to which the former member belonged did not violate the United States Constitution. Appellants in *Rodriguez* had argued that the process for filling vacancies was constitutionally defective because it did not provide for a special election to fill the vacancy and because the interim successor was appointed by a political party rather than an elected official. Although *Rodriguez* did not raise a federal election question, the Court analogized the claim in *Rodriguez* to the one raised in *Valenti* under the Seventeenth Amendment. The *Rodriguez* Court expressly relied on *Valenti* when it stated: "the fact that the Seventeenth Amendment permits a state, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a state is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature." *Id.* 457 U.S. at 11, 102 S.Ct. at 2201.

The interim appointment procedure, the Court said, "serves the legitimate purpose

of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election. The Constitution does not preclude this practical and widely accepted means of addressing an infrequent problem." *Id.* at 12, 102 S.Ct. at 2201.

### C. Concluding Analysis

■ In sum, we have found nothing in the legislative history of the Seventeenth Amendment or in the Supreme Court cases relied upon by the district court that supports a conclusion that a state is constitutionally bound to hold a primary for nominations to fill a senatorial vacancy, either because it has a procedure for primaries in general elections or because it has given political parties some role in the nomination process. The available precedent suggests that the Supreme Court views the manner in which the nominees are selected to have been left to the discretion of the states. *See American Party of Texas v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974) ("It is too plain for argument that the State may ... insist that intraparty competition be settled before the general election by primary election *or by party convention.*" (emphasis added)).

The language of the vacancy provision supports that view. There was a strong contingent in Congress in 1911 that was committed to states' rights and was resistant to any change that would decrease the power and authority of the states and enlarge that of the federal government. *See* Byrd, at 400–01; Haynes, at 110–11. Although this group was defeated in its efforts to couple the direct election of Senators with the deletion of the constitutional provision in Article I, § 4, cl. 1, giving Congress the authority to make or alter the states' provisions as to the times and manner of holding elections for Senators and Representatives, *see* Byrd, at 400–02, the explicit provision in the vacancy paragraph of the Seventeenth Amendment vesting discretion in the state legislatures not once, but twice, cannot have been without significance. Not only does the proviso state that the state legislature "may" empower the

executive to make temporary appointments but, in language which itself could be deemed dispositive of the issue before us, it also states that those interim appointments will continue until filled by an election "as the legislature may direct." U.S. Const. amend. XVII.

The growing trend toward the use of primaries in the years leading up to the passage of the Seventeenth Amendment had by no means become universal. Haynes, at 99–104. Indeed, in the decades following the Amendment's passage, the primary system was still in a stage of early development, and was the subject of much criticism, including the charge that it was anti-democratic. *See* Haynes, vol. 2, at 1070–83. The absence of any reference to a primary election in the Seventeenth Amendment is therefore not surprising.

■ Once we conclude that the Seventeenth Amendment does not mandate that Pennsylvania conduct a primary before holding a general election to fill a senatorial vacancy, it follows that there is no fundamental right that is infringed by the Pennsylvania statute at issue. Thus, there is no basis for the district court to have applied a strict scrutiny standard of review over Pennsylvania's decision that candidates in the unusual situation of a senatorial vacancy either must be nominated by political parties or must file nomination papers signed by the requisite number of voters. *See* 25 Pa.Stat.Ann. §§ 2776, 2911, 2912, 2914. Instead, *Rodriguez* counsels us to apply a more deferential standard of review over a state's choice of the manner in which to fill legislative vacancies. *See* 457 U.S. at 12, 102 S.Ct. at 2201 (whether the "system plainly serves [a] legitimate purpose").

Using this standard of review, it is plain that Pennsylvania's scheme in selecting nominees for Senatorial vacancies is acceptable. The Attorney General of the Commonwealth argues that Pennsylvania's statute serves the interests of "filling vacancies promptly, avoiding unnecessary expense and inconvenience, minimizing the time in office of an unelected Senator, and maximizing voter participation in choosing

a successor." Brief of Commonwealth of Pennsylvania at 18. In *Rodriguez*, the Supreme Court characterized Puerto Rico's decision to fill vacancies in its legislature by appointment by the political party with which the previous incumbent was affiliated as a "practical and widely accepted means of addressing an infrequent problem." 457 U.S. at 12, 102 S.Ct. at 2201. Pennsylvania's system, which minimizes the time in office of an unelected Senator, cannot be any less acceptable.

We do not discount the argument of Professor Little that "the people" can exercise the most meaningful choice over their representatives "only if there is popular control of the nomination process." Brief of Amicus Curiae Little at 9. However, that is an argument that must be addressed to the legislature, which has been given the discretion by the Seventeenth Amendment to direct the manner in which the vacancy election is to be conducted. The legislature is free to decide that it is not in the interests of the state to require that a special primary, with its attendant expense for the state and the candidates, be held before the special election when, as in the tragic circumstances of Senator Heinz's death, the vacancy occurs too late to be filled in the usual spring primary. Just as the decision of the New York legislature in similar circumstances to hold primaries in June, instead of September, and to have senatorial vacancies filled at the same election as that for Representatives was considered reasonable, so also must Pennsylvania's decision that the interests of its voters will be best accommodated by giving them an opportunity to express their preference as to representation in a special election as promptly as possible, without an intervening primary.

It is ironic, although apparently overlooked by the parties, that Pennsylvania's original statute enacted immediately after the ratification of the Seventeenth Amendment did provide for primaries in connection with the election to fill a senatorial vacancy. *See* 1913 Pa.Laws No. 454, § 3 ("Whenever a vacancy shall happen in the representation of this Commonwealth in the Senate of the United States, the said vacancy shall be filled, for the unexpired term, by the vote of the electors at a special election held at the time of the next general election whose antecedent primary occurs at least sixty days after the happening of such vacancy, and it shall be the duty of the Governor to issue writs of election accordingly."); *see also Valenti*, 292 F.Supp. at 860 ("Only one statute, that of Pennsylvania, specifically provided that the candidates [in a vacancy election] were to be selected through a primary procedure."). Whatever the reason for Pennsylvania to have changed that procedure in 1937, *see* 25 Pa.Stat.Ann. § 2776 (1963), we must accord the state's decision, undoubtedly "passed in response to the state's actual experience in these matters," *Valenti*, 292 F.Supp. at 866, to be "a permissible exercise of [its] discretion." *Id.*

We take no position on the balancing of the respective interests in this situation. That is a function for which the legislature is uniquely fitted. If the voters of the state are unhappy with the legislature's decision, then the democratic process gives them ample opportunity for redress.

## IV.

### The Fourteenth Amendment

■ The district court held that section 2776 violated the Fourteenth Amendment as well as the Seventeenth Amendment.

Relying upon precedent that primary votes must be weighed equally, the court stated that "[b]ecause the statute allows parties to make distinctions that deny him his right to vote, Trinsey has an equal protection claim as a voter." Op. at 1345 & n. 10. Of course, Pennsylvania's statute, unlike those considered by the Supreme Court in the White Primary Cases, does not allow some people to vote in a primary and deny that opportunity to others. All of Pennsylvania's citizens are deprived of the opportunity to vote in a vacancy primary.

The inequality to which the district court was referring was that occasioned by the disenfranchisement of Trinsey, and the other political party members of both parties

for whom he purports to speak, in the selection of the political party's nominee, a privilege given under the rules of the major political parties to the members of the Parties' state committees. Although Trinsey has made an eloquent plea on behalf of those who wish their voices to be heard and counted in that selection, the Supreme Court's decision in *Rodriguez* is dispositive of the equal protection claim. In light of the *Rodriguez* holding that the Equal Protection Clause was not violated by a system which excluded independents and persons affiliated with parties other than that of the deceased incumbent from voting in the by-election to fill the vacant seat, 457 U.S. at 10, 14, 102 S.Ct. at 2200, we cannot find any Equal Protection violation in Pennsylvania's decision to leave the nomination procedure to Party rules that in effect disenfranchise the Party's members.[8]

## V.

### Conclusion

The foregoing discussion makes inevitable our conclusion that the district court's judgment that Pennsylvania's statute, 25 Pa.Stat.Ann. § 2776 (1991), is unconstitutional cannot stand. In so holding, we acknowledge the commitment in time, effort and energy made by the *pro se* plaintiff, John S. Trinsey, Jr., to the process by which this case of first impression was brought into the judicial process and thereby to public attention and debate. It is in that arena, in the last analysis, that the result that he desires must ultimately be decided.

For the reasons set forth above, we will reverse the judgment of the district court, and remand with directions to enter judgment for the defendants. The mandate shall issue forthwith. Each party is to bear its own costs.

---

**8.** In light of our decision, we need not decide whether a Party's choice of its nominee through internal party procedures is state action within the meaning of the Fourteenth Amendment, an issue raised in the brief of Intervenors–Appellants Specter *et al.*