**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM PRICE TEDARDS, JR.;
MONICA WNUK; BARRY HESS;
LAWRENCE LILIEN; ROSS TRUMBLE,
   *Plaintiffs-Appellants*,

v.

DOUG DUCEY, Governor of Arizona,
in his official capacity; MARTHA
MCSALLY,
   *Defendants-Appellees.*

No. 19-16308

D.C. No.
2:18-cv-04241-
DJH

OPINION

Appeal from the United States District Court
for the District of Arizona
Diane J. Humetewa, District Judge, Presiding

Argued and Submitted November 13, 2019
Pasadena, California

Filed February 27, 2020

Before:  MILAN D. SMITH, JR., ERIC D. MILLER,
and DANIEL P. COLLINS, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Collins

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of an action, brought following the death of Arizona Senator John McCain in 2018, challenging the constitutionality of an Arizona statute that governs appointments and elections in the aftermath of a vacancy in the United States Senate.

Senator McCain died on August 25, 2018, three days before the primary election. Over four years remained in his Senate term. Consistent with the requirements of Arizona Revised Statute § 16-222(D), as amended, Governor Doug Ducey (Republican) issued a writ of election to fill Senator McCain's vacant seat in November 2020, and appointed a temporary Senator until the winner of the November 2020 election assumed office. The panel noted that by that time, Arizona will have had a temporary appointee, currently Senator Martha McSally, chosen by the Governor, for over two years. Plaintiffs, Arizona voters and a would-be Senate candidate, alleged that the November 2020 vacancy election date and the 27-month interim appointment duration violated the time constraints implicit in the Seventeenth Amendment and impermissibly burdened their right to vote, as protected by the First and Fourteenth Amendments. Plaintiffs further challenged Arizona's statutory mandates that the Governor must make a temporary appointment and must choose a member of the same party as the Senator who vacated the office.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel noted that in 1913, the Seventeenth Amendment fundamentally changed the structure of the national government by providing that United States Senators be "elected by the people." Prior to the adoption of the Seventeenth Amendment, the Constitution gave the power of choosing Senators to the state legislatures. The original provision also empowered a State Governor, in the event of a vacancy arising during a legislative recess, to make a "temporary" appointment pending the next legislative session. The Seventeenth Amendment retained this vacancy and appointment provision in modified form, and it is that portion of the Amendment which the panel addressed.

The panel first considered plaintiffs' Seventeenth Amendment challenge to the November 2020 vacancy election date and the 21-month duration of appointed representation. The panel noted that the meaning of the Seventeenth Amendment has seldom been litigated, and no body of doctrine provided robust guidance as to its proper interpretation. The panel therefore used multiple modes of analysis and sources of authority to decipher the Amendment's meaning. The panel concluded that the text of the Seventeenth Amendment conferred some discretion upon the States as to both the timing of an election to fill a vacancy and the duration of an interim appointment, and that the text was ambiguous as to the outer bounds of this discretion. The panel did not find that related constitutional provisions placed any precise temporal limitations upon vacancy elections or appointments under the Seventeenth Amendment. The panel's review of the historical context led it to disfavor any interpretation that permitted excessively long vacancies, but the panel noted that the context did not reveal any precise constraints. The legislative history did not provide a clear view of the textual

interpretation possessed by the members of Congress who voted in favor of the Seventeenth Amendment. The state statutes enacted after the Seventeenth Amendment's ratification favored, but did not compel, an interpretation of the Seventeenth Amendment that left States broad discretion to schedule a vacancy election up until the next general election preceded by some reasonable period of time in which to hold the election.

The panel next turned to the four prior cases that have interpreted the Seventeenth Amendment's Vacancy Clause at any length, and concluded that plaintiffs' challenge was foreclosed by binding precedents. Thus, the panel noted that the Supreme Court had spoken to the meaning of the relevant Seventeenth Amendment provisions in two cases. First, the panel noted that in *Valenti v. Rockefeller*, a three-judge district court, in considering a 29-month Senate seat vacancy following Robert F. Kennedy's assassination, had conducted a detailed analysis of the relevant Seventeenth Amendment provisions in both a majority and a dissenting opinion, and had dismissed plaintiffs' complaints. The Supreme Court then summarily affirmed the majority's dismissal. 292 F. Supp. 851 (W.D.N.Y. 1968), *summarily aff'd*, 393 U.S. 405 (1969) (per curiam). Second, in *Rodriguez v. Popular Democratic Party*, the Supreme Court opined on a related constitutional question in part based on a particular interpretation of the result it had summarily affirmed in *Valenti*, and also endorsed some of the reasoning of the *Valenti* three-judge district court majority. 457 U.S. 1, 10–12 (1982). The panel concluded that it was bound by *Rodriguez*'s 29-month interpretation of the binding result of *Valenti.* The panel further interpreted *Rodriguez* to endorse only a State's discretion to *postpone* a vacancy election *until* a general election.

Turning to the challenged Arizona law, the panel held that the timing provision of A.R.S. § 16-222(D) as applied to the McCain vacancy was a permissible exercise of the State's discretion under the Seventeenth Amendment. Accordingly, neither Governor Ducey's writ of election nor Senator McSally's appointment was a violation thereof. The panel therefore affirmed the district court's dismissal of Counts I and II of plaintiffs' amended complaint to the extent that those counts related to the timing of the vacancy election and the duration of appointed representation under the Seventeenth Amendment.

Addressing plaintiffs' First and Fourteenth Amendment challenges, the panel assumed, without deciding, that regulation of the timing of a vacancy election was at least a "burden" for purposes of review under *Burdick v. Takushi*, 504 U.S. 428 (1992). However, because the panel held that the Seventeenth Amendment authorized at least as long of an interval before the vacancy election as was challenged here, it concluded that the burden thereby posed was necessarily a "reasonable" one. The panel held that plaintiffs failed to plausibly allege that the timing of the vacancy election was not justified by "important" state interests. Given that the burden of this timing on plaintiffs' right to vote was "reasonable" and "nondiscriminatory," the "important" state interests were sufficient to affirm the dismissal of plaintiffs' First and Fourteenth Amendment challenges.

The panel held that plaintiffs lacked standing to challenge the appointment mandate and same-party restrictions in A.R.S. § 16-222(D). The panel held that given that Arizona's legislature empowered the state governor to make temporary appointments, Governor Ducey unquestionably had the authority to appoint Martha McSally

as a temporary replacement for Senator McCain. Plaintiffs alleged no facts rebutting Governor Ducey's statement on appeal that he would have appointed Senator McSally regardless of the requirement that he name an interim Senator and regardless of the requirement that the appointee share Senator McCain's political party. Accordingly, the panel held that plaintiffs suffered no injuries from the appointment of Senator McSally that were fairly traceable to § 16-222(C), and suffered no injury attributable to the mere existence of § 16-222(C) since it had not affected them. This lack of traceability was fatal to standing.

Concurring in part and concurring in the judgment, Judge Collins agreed with the majority that the district court properly dismissed plaintiffs' various constitutional challenges to the Arizona statute governing the filling of senatorial vacancies, but in Judge Collins's view the issues raised in this case could be readily resolved under existing precedent. Judge Collins therefore did not join the analysis as to the meaning of the Seventeenth Amendment in section I(A) of the "Analysis" section of the majority's opinion. Instead, he joined only Parts I(B), II, and III of the "Analysis" section, and concurred in the judgment.

## COUNSEL

Michael P. Persoon (argued) and Thomas H. Geoghegan, Despres Schwartz and Geoghegan Ltd., Chicago, Illinois; Michael Kielsky, Udall Shumway, Mesa, Arizona; for Plaintiffs-Appellants.

Dominic E. Draye (argued), Greenberg Traurig LLP, Phoenix, Arizona; Anni Lori Foster, General Counsel, Office of the Governor, Phoenix, Arizona; Brett W. Johnson

and Colin Ahler, Snell & Wilmer LLP, Phoenix, Arizona; James E. Tyrrell III, Venable LLP, Washington, D.C.; for Defendants-Appellees.

Spencer G. Scharff, Scharff PLLC, Phoenix, Arizona, for Amici Curiae Vox Populi Foundation and Arizona Advocacy Network Foundation.

Theresa Amato and Carlton Mosley, Shearman & Sterling LLP, Washington, D.C., for Amici Curiae Professors Erwin Chemerinsky, Helen Hershkoff, Alexander Keyssar, Lawrence Lessig, and Sanford Levinson.

Michael A. Curtis, Law Offices of Michael A. Curtis, Phoenix, Arizona; Robert S. Lynch and Caroline G. Lynch, Robert S. Lynch & Associates, Phoenix, Arizona; for Amici Curiae Irrigation and Electrical Districts' Association of Arizona (IEDA) and Arizona Municipal Power Users' Association (AMPUA).

---

**OPINION**

M. SMITH, Circuit Judge:

In 1913, the Seventeenth Amendment fundamentally changed the structure of our national government by providing that United States Senators be "elected by the people." U.S. Const. amend. XVII para. 1. Prior to the adoption of the Seventeenth Amendment, the Constitution gave the power of choosing Senators to the state legislatures. *Id.* art. I, § 3 (amended 1913). The original provision also empowered a State Governor, in the event of a vacancy arising during a legislative recess, to make a "temporary" appointment pending the next legislative session. *Id.* The

Seventeenth Amendment retained this vacancy and appointment provision in modified form, and it is that portion of the Amendment with which we are primarily concerned in this case.   The relevant portion of the Amendment reads as follows:

> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

U.S. Const. amend. XVII para. 2.

Arizona Senator John McCain died in August 2018, leaving vacant one of Arizona's two U.S. Senate seats. Pursuant to Arizona law, the people of Arizona will fill the vacancy by election in November 2020.   By that time, Arizona will have had a "temporary" appointee, currently Senator Martha McSally, for over two years.   Plaintiffs, Arizona voters and a would-be Senate candidate, challenge the constitutionality of the Arizona statute that governs appointments and elections in the aftermath of a Senate vacancy.

First, Plaintiffs argue that the November 2020 vacancy election date and the 27-month interim appointment duration violate the time constraints implicit in the Seventeenth Amendment.  The district court dismissed this challenge for failure to state a claim, finding no authority for invalidating a state statute on this basis.  We affirm.  Although we find Plaintiffs' interpretation a possible one based on the text and

history of the Seventeenth Amendment, we conclude that it is foreclosed by binding precedents.

Second, Plaintiffs argue that the November 2020 vacancy election date impermissibly burdens their right to vote as protected by the First and Fourteenth Amendments. The district court also dismissed this challenge for failure to state a claim, finding that important State regulatory interests justify what is a reasonable and nondiscriminatory restriction on Plaintiffs' right to vote. We agree, and affirm.

Third and finally, Plaintiffs challenge Arizona's statutory mandates that the Governor must make a temporary appointment and must choose a member of the same party as the Senator who vacated the office. Plaintiffs argue that the appointment mandate violates the Seventeenth Amendment's specified separation of State powers, as well as the Fourteenth Amendment and the Elections Clause. The district court dismissed this challenge for failure to state a claim, rejecting Plaintiffs' interpretation of the relevant Seventeenth Amendment language. Plaintiffs argue that the same-party restriction violates the Qualifications Clauses in the Seventeenth Amendment and other constitutional provisions, as well as the First Amendment and the Elections Clause. The district court dismissed this challenge for lack of standing. The district court found no harm on the basis of representation by a Republican and no redressability where the Republican Governor would appoint a Republican anyway. We affirm both of these dismissals for lack of standing.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background

In November 2016, the people of Arizona reelected Senator John S. McCain III (Republican) to a sixth term in the United States Senate. In July 2017, doctors diagnosed Senator McCain with an aggressive brain tumor whose victims have only a fourteen-month average survival time.[1]

In May 2018, Governor Ducey signed into law an amendment to Arizona's congressional vacancy statute, Arizona Revised Statutes (A.R.S.) § 16-222. *See* 2018 Ariz. Sess. Laws 2308. Pursuant to the amended law, if a Senate seat becomes vacant 150 days or fewer before the next primary election (or between the primary and the general election), the people of Arizona will not fill the vacancy by election until the following general election two years later. *See* A.R.S. §§ 16-222(A), (D).[2] The Governor must

---

[1] Susan Scutti, *Sen. John McCain has brain cancer, aggressive tumor surgically removed*, CNN (July 20, 2017), https://www.cnn.com/2017/07/19/health/gupta-mccain-glioblastoma/index.html.

[2] As amended, A.R.S. § 16-222(A) provides that "[w]hen a vacancy occurs in the office of United States senator . . . , *and except as provided in subsection D of this section*, the vacancy shall be filled at the next general election." 2018 Ariz. Sess. Laws 2308 (emphasis added). A.R.S. § 16-222(D) provides that:

> If a vacancy in the office of United States senator occurs one hundred fifty days or less before the next regular primary election date, . . . the vacancy [will be] filled at the second regular general election held after the vacancy occurs . . . .

"appoint a person to fill the vacancy" in the interim,[3] who is "of the same political party as the person vacating the office." *Id.* § 16-222(C). At the time the legislature passed this amendment, the August 2018 primary was already fewer than 150 days away. Senator McCain was still serving as Senator at that time.[4]

---

*Id.* at 2308–09. In 2018, Arizona law provided for regular primary elections "[o]n the tenth Tuesday prior to a general . . . election." 2009 Ariz. Sess. Laws 1268, *amended by* 2019 Ariz. Sess. Laws Ch. 246 (current version at A.R.S. § 16-201). The 2018 general election was scheduled nationally for November 6, 2018. *See* 2 U.S.C. §§ 1, 7. Therefore, Arizona's primaries were held on August 28, 2018. Subtracting 150 days from August 28, 2018, yields a date of March 31, 2018, which is slightly more than seven months before November 6, 2018. Arizona has since amended its primary election schedule to make the primaries fall earlier in August. *See* A.R.S. § 16-201 (amended 2019).

Prior to the May 2018 amendment, A.R.S. § 16-222 contained no special provision for vacancies occurring within a particular time period before the next election. A.R.S. § 16-222(A) provided only that "[w]hen a vacancy occurs in the office of United States senator . . . , the vacancy shall be filled at the next general election." 2012 Ariz. Sess. Laws 2543, *amended by* 2018 Ariz. Sess. Laws 2308. In the event of a vacancy occurring "after the close of petition filing" for the primary, a related statute gave the power of candidate nomination to the political party of the vacating Senator. A.R.S. § 16-343 (last amended by 2017 Ariz. Sess. Laws 959).

[3] As amended, A.R.S. § 16-222(C) provides that, "*except as provided in subsection D of this section*, [the appointee] shall serve until the person elected at the next general election is qualified and assumes office." 2018 Ariz. Sess. Laws 2308 (emphasis added).

[4] Bill Hutchinson, *Sen. John McCain showing 'maverick' spirit even as he battles brain cancer*, ABC News (May 6, 2018), https://abcnews.go.com/ABCNews/sen-john-mccain-showing-maverick-spirit-battles-brain/story?id=54974427.

Senator McCain died on August 25, 2018, three days before the primary election.[5]  Over four years remained in his Senate term.  Consistent with the requirements of § 16-222(D), as amended, Governor Doug Ducey (Republican) issued a writ of election to fill Senator McCain's vacant seat in November 2020.  Consistent with the requirements of § 16-222(C), Governor Ducey appointed former Arizona Senator Jon Kyl (Republican) to serve as Senator until the winner of the November 2020 election assumed office. Senator Kyl made clear that he would not personally seek election in 2020.[6]

At the time of these developments, the contest for Arizona's other Senate seat was already on the ballot for November 2018.  Competing to replace Senator Jeff Flake (Republican), who had decided not to seek reelection, were Representative Kyrsten Sinema (Democrat) and Representative Martha McSally (Republican). Representative Sinema won the election with 50.0% of the vote compared to Representative McSally's 47.6%.[7]

In mid-December 2018, Senator Kyl announced that he would resign at the end of the year so that a subsequent appointee could serve the full two years of the 116th

---

[5] Robert D. McFadden, *John McCain, War Hero, Senator, Presidential Contender, Dies at 81*, N.Y. Times (Aug. 25, 2018), https://www.nytimes.com/2018/08/25/obituaries/john-mccain-dead.html.

[6] Jonathan Martin & Danny Hakim, *Jon Kyl, Former Senator, Will Replace McCain in Arizona*, N.Y. Times (Sept. 4, 2018), https://www.nytimes.com/2018/09/04/us/politics/arizona-senate-mccain.html.

[7] Green Party candidate Angela Green, who officially endorsed Sinema days before the election, received 2.4% of the vote.

Congress and seek election in 2020.[8] Days later, Governor Ducey announced that he had appointed Representative McSally to succeed Senator Kyl.[9]

At present, Senators Sinema and McSally represent Arizona in the United States Senate.

## II. Procedural Background

In late November 2018, five registered Arizona voters—two Democrats, one Independent, one Libertarian, and one Republican—filed suit against Governor Ducey and Senator Kyl pursuant to 42 U.S.C. § 1983. Plaintiffs alleged that the Governor's implementation of A.R.S. § 16-222 violated their constitutional rights under the Seventeenth Amendment and several other provisions of the U.S. Constitution. Their amended complaint challenged the November 2020 date of the vacancy election (Count I),[10] the

---

[8] Sean Sullivan & John Wagner, *Kyl plans to resign Arizona Senate seat, clearing the way for another GOP appointment*, Wash. Post (Dec. 14, 2018), https://www.washingtonpost.com/politics/kyl-plans-to-resign-arizona-senate-seat-clearing-the-way-for-another-gop-appointment/2018/12/14/12bae21e-ffb1-11e8-83c0-b06139e540e5_story.html.

[9] Press Release, Office of Governor Ducey, Governor Ducey Appoints Martha McSally to U.S. Senate (Dec. 18, 2018), https://azgovernor.gov/governor/news/2018/12/governor-ducey-appoints-martha-mcsally-us-senate.

[10] Count I alleged that the "delay[]" of the vacancy election until November 2020, being "significantly greater than a year" after the occurrence of the vacancy, violates Plaintiffs' right to fill the vacancy by election under the Seventeenth Amendment. Count I also alleged that this delay, by encompassing more than a "reasonable and brief interim period[] necessary to hold an orderly election," violates Plaintiffs' right to continuous direct representation under the Fourteenth Amendment Privileges or Immunities Clause. Count I further alleged that this delay,

27-month duration and mandatory nature of the interim appointment (Count II),[11] and the same-party restriction on the interim appointee (Count III).[12] Plaintiff Hess later alleged that he sought to be considered for the interim appointment, but was barred from consideration as a registered Libertarian.

In late December 2018, Plaintiffs filed a motion for preliminary and permanent injunction. Plaintiffs sought an order directing that the election to fill the vacancy be held "as soon as practicable, and not longer than one year from

---

being "just too long" and a "de facto denial of a special election," severely burdens Plaintiffs' right to vote in violation of the First Amendment and the Fourteenth Amendment Equal Protection Clause.

[11] Count II alleged that, by "mandating" that the Governor make an interim appointment, § 16-222(C) violates the Seventeenth Amendment's provision that the state legislature may only "empower" the Governor to make an appointment. Count II further alleged that, by providing that the people will have appointed representation for approximately 27 months, § 16-222(D) violates Plaintiffs rights under the Seventeenth Amendment to be subject only to "temporary" appointments. Count II also alleged that the 27-month appointment duration violates Plaintiffs' rights under the Fourteenth Amendment Privileges or Immunities Clause to have elected representation at all times "except for the brief interim periods necessary to conduct an orderly election."

[12] Count III alleged that, by restricting the Governor's appointment discretion to a person of the same political party as the vacating Senator, § 16-222(D) exceeds the state legislature's authority under the Seventeenth Amendment, the Elections Clause, and the Qualifications Clause. Count III further alleged that the same-party restriction violates Plaintiffs' First Amendment rights by "giving the imprimatur of state law to . . . a particular partisan viewpoint."

the date the vacancy arose." Defendants, by then Governor Ducey and Senator McSally, moved to dismiss.[13]

In June 2019, after full briefing and oral argument, the district court granted Defendants' motion to dismiss. The court dismissed Counts I and II for failure to state a claim. The court disagreed that the Seventeenth Amendment constrains state discretion as Plaintiffs had alleged with regard to the date of the vacancy election, the duration of appointed representation, or the mandate that the Governor make an appointment. The court also concluded that the November 2020 vacancy election date was a reasonable burden on Plaintiffs' First and Fourteenth Amendment right to vote and was justified by important state interests. The court dismissed Count III for lack of standing. The court concluded that any harm attributable to representation by a Republican was too speculative to constitute a cognizable injury. The court further concluded that redressability was lacking because Governor Ducey could keep Senator McSally in place even without the statutory same-party requirement. Since it found no viable claims, the court denied Plaintiffs' motion for a preliminary and permanent injunction.

---

[13] Defendants argued that the Constitution gives States broad discretion to establish procedures for filling Senate vacancies and that § 16-222 complies with the "plain language" of the Seventeenth Amendment. They argued that binding precedent allows at least a 29-month Senate appointment. They also argued that Arizona's procedure for holding a vacancy election is reasonable, nondiscriminatory, and in furtherance of important state interests. Alternately, Defendants argued that this case presents a nonjusticiable political question. As to the same-party requirement, Defendants argued that the requirement is constitutional under both the First Amendment and the Qualifications Clause, and that Plaintiffs lack standing to challenge it.

Plaintiffs timely appealed, and thereafter moved to expedite this appeal. We granted Plaintiffs' motion to expedite.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's grant of a motion to dismiss and all constitutional questions. *Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).

## ANALYSIS

## I. Seventeenth Amendment Challenge to Vacancy Election Date and Duration of Appointment

We begin with Plaintiffs' as-applied Seventeenth Amendment challenges to the November 2020 vacancy election date and the 27-month duration of appointed representation. We consider these two challenges together because both require an analysis of what, if any, implicit time constraints exist within the Seventeenth Amendment. The meaning of the Seventeenth Amendment has seldom been litigated, and no body of doctrine provides us with robust guidance as to its proper interpretation. We therefore undertake here to decipher the Amendment's meaning using multiple modes of analysis and sources of authority. After reaching a conclusion regarding that meaning, we turn to the law challenged in this case.

### A. Meaning of the Seventeenth Amendment

The parties hold very different views of the extent to which the Seventeenth Amendment restricts state discretion regarding the timing of a vacancy election and the duration of an interim appointment. Plaintiffs argue that the

Seventeenth Amendment gives States very little discretion—that it requires a State to hold a vacancy election as quickly after the occurrence of a vacancy as the State holds a general election after petition filing. Plaintiffs argue that in most cases this means that a vacancy election will be held within, and an interim appointment will last no longer than, one year. Defendants argue that the Seventeenth Amendment gives States very broad discretion—that it does not carry any time constraint on vacancy elections or interim appointments at all beyond the deadline imposed by the end of the vacant term.

The Supreme Court has spoken to the meaning of the relevant Seventeenth Amendment provisions in two cases. First, in *Valenti v. Rockefeller*, a three-judge district court conducted a detailed analysis of the relevant provisions in both a majority and a dissenting opinion, and the Supreme Court summarily affirmed the majority. 292 F. Supp. 851 (W.D.N.Y. 1968), *summarily aff'd*, 393 U.S. 405 (1969). Second, in *Rodriguez v. Popular Democratic Party*, the Supreme Court opined on a related constitutional question in part based on a particular interpretation of the result it had summarily affirmed in *Valenti*, and also endorsed some of the reasoning of the *Valenti* three-judge district court majority. 457 U.S. 1, 10–12 (1982).

Normally, a summary affirmance binds us to the precise result affirmed, yet it remains incumbent upon us to give full consideration to the issues and articulate our own independent analysis. *See Anderson v. Celebrezze*, 460 U.S. 780, 784–85 & n.5 (1983); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979). In this instance, the Supreme Court has provided some additional analysis of its own, *see Rodriguez*, 457 U.S. at 10–12, but in an opinion that "did not

. . . purport to be a thorough examination" of the Seventeenth Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 623 (2008). We therefore undertake a full analysis here, but we do not reach any dispositive interpretive conclusions until we come to *Rodriguez* and consider our analysis in light of the reasoning therein.

Our analysis proceeds as follows, taking inspiration from the method by which the Supreme Court analyzed the meaning of the then little-litigated Second Amendment in *District of Columbia v. Heller*[14]: We begin with a close

---

[14] In *Heller*, the Supreme Court announced its first "thorough examination of the Second Amendment." 554 U.S. at 623. Writing for the majority, Justice Scalia began with a textual analysis aiming to identify the meaning of the Second Amendment as it "would . . . have been known to ordinary citizens in the founding generation." *Id.* at 576–77. In the process of analyzing the text, he considered the natural and logical reading of the text on close examination; other uses of identical language elsewhere in the Constitution; founding-era dictionary definitions; other uses of similar language in such founding-era sources as The Federalist Papers and State constitutions; and the historical circumstances motivating the founders to codify the Second Amendment in the Constitution. *Id.* at 576–600.

Justice Scalia devoted a second section to greater analysis of the contemporary State constitutions codifying a similar right. *Id.* at 600–03. He next considered the Amendment's drafting history, though he expressed doubt about relying on analysis of prior rejected proposals. *Id.* at 603–05. He then considered postratification interpretation, as evidenced by commentary, case law, and legislation, both close in time to ratification and specifically in the post-Civil War context. *Id.* at 605–19. Finally, he considered "whether any of [the Court's] precedents foreclose[d]" the majority's interpretation. *Id.* at 619. In that discussion, he specifically rejected reliance on *United States v. Miller*, 307 U.S. 174 (1939), which "did not even purport to be a thorough examination of the Second Amendment," and in which only one party had (only minimally) briefed the Amendment's history. *Id.* at 623–24 (discussing).

examination of the Seventeenth Amendment's text. In subsection 1, we attempt to discern the most natural reading of the text standing alone. In subsection 2, we consider the text in the context of related constitutional provisions. Subsection 3 then considers the text in the context of the historical circumstances motivating Congress and the ratifying States to amend the Constitution. In subsection 4, we consider the interpretations of the Seventeenth Amendment provided by the sponsor of the final version in the Senate and the author of a materially similar version in the House. In subsection 5, we consider the interpretations evidenced by state legislative enactments in the immediate aftermath of the Seventeenth Amendment's ratification. Finally, in subsection 6, we analyze prior cases interpreting the relevant portion of the Seventeenth Amendment, including and especially *Valenti* and *Rodriguez*, and come to our ultimate conclusion.

### 1. Text

We begin with the text of the Seventeenth Amendment standing alone. The second paragraph of the Seventeenth Amendment (hereinafter the Vacancy Clause) comprises two subclauses. We refer to the first as the principal clause:

> When vacancies happen in the representation
> of any State in the Senate, the executive

---

Writing for four dissenting Justices, Justice Stevens likewise focused on "the most natural reading of the Amendment's text and the interpretation most faithful to the history of its adoption." *Id.* at 638 (Stevens, J., dissenting). He nevertheless reached a different conclusion from the majority, which he argued was required by *Miller*. *Id.* at 637–40.

> authority of such State shall issue writs of
> election to fill such vacancies: . . .

U.S. Const. amend. XVII para 2.  We refer to the second as
the proviso:

> . . . *Provided*, That the legislature of any State
> may empower the executive thereof to make
> temporary appointments until the people fill
> the vacancies by election as the legislature
> may direct.

*Id.*

The principal clause begins with a trigger: "When
vacancies happen in the representation of any State in the
Senate, . . . ."  This trigger does not expressly invoke the
discretion of the state legislature or any other decisionmaker.
We read the word "when" to denote both "immediately
after" and "every time that."  Thus, every vacancy
immediately triggers the Vacancy Clause when it happens.
The trigger gives no express guidance as to the types of
events that cause a vacancy to "happen," but no ambiguity
on that point is before us.  We have no doubt that the death
of a Senator causes a vacancy to happen.

The principal clause then directs that ". . . the executive
authority of such State shall issue writs of election to fill
such vacancies: . . . ."  We assume "executive authority"
refers to a state's Governor, but we need not consider
whether a Governor could delegate the relevant authority to
an executive agency or other executive officer.  We interpret
the word "shall" as imposing a mandatory obligation on the
Governor.  *See* Zachary D. Clopton & Steven E. Art, *The
Meaning of the Seventeenth Amendment and a Century of
State Defiance*, 107 Nw. U. L. Rev. 1181, 1202 n.79 (2013)

(canvassing uses of the word "shall" in the Constitution, all of which are obligatory); *accord Judge v. Quinn*, 612 F.3d 537, 547 (7th Cir. 2010) (*Judge I*), *amended by* 387 F. App'x 629 (7th Cir. 2010) (*Judge II*), *cert. denied sub nom. Quinn v. Judge*, 563 U.S. 1032 (2011).

A writ of election is the traditional device for initiating a popular election. *Id.* at 552 (collecting evidence regarding writs of election from the Glorious Revolution, the Founding period, the Seventeenth Amendment era, and the present day). A writ of election "plays the important administrative role of authorizing state officials to provide for the myriad details necessary for holding an election (printing ballots, locating voting places, securing election personnel, and so on)." *Id.* At the time the Seventeenth Amendment was drafted, "it was settled that the state executive's power to issue a writ of election carried with it the power to establish the time for holding an election, but only if the time had not already been fixed by law." *Id.* (citing, *inter alia*, George W. McCrary, *A Treatise on the American Law of Elections* 166 (2d ed. 1880)). The "writ of election" reference thus appears to allow some discretion on the part of the State Governor or legislature to choose the date on which the election will be held.

We interpret the phrase "writs of election to fill such vacancies" also as a cross-reference to the Seventeenth Amendment's first paragraph, which states that Senators shall be "elected by the people" of each state, and which provides the qualifications for electors. U.S. Const. amend. XVII para 1. We thus understand the Vacancy Clause to require a writ of election that orders an election by the people, where "the people" is composed of those individuals having the requisite qualifications to vote in a Senate election.

We read "to fill such vacancies" to refer to the election of a Senator who will represent the state for the remainder of the term in which the vacancy occurred.  This language appears to assume that a non-de minimis period of time remains in the term, and that an orderly election is capable of filling it.  That is, the duty to call an election might not apply if the vacancy happens so late in the term that it is not feasible to hold an orderly election quickly enough that the elected Senator will serve for more than a de minimis period of time.  *Cf. ACLU v. Taft*, 385 F.3d 641, 648 (6th Cir. 2004) (citing *Jackson v. Ogilvie*, 426 F.2d 1333, 1336–37 (7th Cir. 1970)).  This language may also suggest that the State *should* leave some non-de minimis period of the vacancy for the people to fill by election to the extent it is within the State's discretion to do so.

The proviso begins with the authorization, "*Provided*, That the legislature of any State may empower the executive authority thereof to make temporary appointments . . . ."  This language appears to give the legislature discretion as to whether the State will utilize the mechanism of temporary appointments.[15]  We interpret the phrase "make temporary appointments," by reference to the Senate vacancy invoked by the principal clause, to mean appoint a person to serve, temporarily, as Senator in the vacant seat.

The key issue here is the word "temporary."  On its face, the term "temporary" is vague.  In context, however, we are

---

[15] We decline to address here whether the state legislature's discretion extends so far as to encompass mandating that the executive make appointments, or defining the qualifications of appointees.  We therefore also do not address how much, if any, discretion regarding appointments the proviso preserves for the state executive.  As we explain in section 0, *infra*, we find that Plaintiffs lack standing to raise these arguments.

able to discern some meaning.  First, we think the term must be read in relation to the six-year term of a Senator stated in the preceding paragraph.  We would have difficulty reading it to approach anything nearing that full six-year term.

Second, the proviso concludes with language placing a specific limit on the duration of "temporary": ". . . until the people fill the vacancies by election as the legislature may direct."  The tenure of a Governor's appointee is thus limited by the timing of a popular election to fill the vacancy. Without more context, however, this language does not establish the *precise* amount of time that may elapse before the Seventeenth Amendment compels an election by the people to fill the vacancy.  Indeed, this language expressly grants the state legislature some degree of discretion regarding that timing.

Contrary to the Third Circuit in *Trinsey v. Pennsylvania*, 941 F.2d 224 (3d Cir. 1991), *cert. denied*, 502 U.S. 1014 (1991), we do not read the proviso's two express references to state legislative discretion—"the legislature of any State may empower" and "as the legislature may direct"—as creating state legislative discretion over the whole of the Vacancy Clause.  *See id.* at 234.  Rather, we read these grants of discretion as modifying the specific terms they immediately relate to within the proviso.  *Cf. Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (explaining the "'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").  Thus, the first grant confers discretion as to whether a state legislature "empower[s]" the Governor "to make temporary appointments."  The second grant confers discretion as to the "direct[ing]" of a vacancy "election."  To read either grant

of discretion more broadly would render the other grant superfluous.

Instead, we agree with the Seventh Circuit in *Judge I* that "as the legislature may direct" does not modify the principal clause's mandate that a Governor issue a writ of election when a vacancy happens. *See* 612 F.3d at 549. We further agree with the Seventh Circuit that the proviso acts as a qualifier on the principal clause, rather than as an alternative option for responding to Senate vacancies. *See id.* at 551.

In sum, the text of the Seventeenth Amendment confers some discretion upon the States as to both the timing of an election to fill a vacancy and the duration of an interim appointment. The text is ambiguous as to the outer bounds of this discretion.

## 2.  Constitutional Context

We now consider other constitutional provisions closely related to the Seventeenth Amendment. Portions of the Seventeenth Amendment Vacancy Clause appear in, or cross-reference, sections 2, 3, and 4 of Article I of the unamended Constitution. The meaning of identical, similar, or explanatory language in these provisions has the potential to bring the meaning of the Vacancy Clause into sharper focus.

The Seventeenth Amendment Vacancy Clause specifically replaced the following language from Article I, section 3, of the unamended Constitution:

> . . . and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments

> until the next Meeting of the Legislature,
> which shall then fill such Vacancies.

U.S. Const. art. I, § 3, cl. 2, *amended by* U.S. Const. amend. XVII (hereinafter the Unamended Vacancy Clause). The Seventeenth Amendment Vacancy Clause nevertheless retains much of this language.[16]

Most notably for our purposes, both Vacancy Clauses contain temporal limitations, including specifically that appointments be "temporary." The Unamended Vacancy Clause provided two other express limitations: the trigger is limited to vacancies that happen "during the Recess of the Legislature of any State," and the appointment lasts only "until the next Meeting of the Legislature, which shall then fill such Vacancies." The Seventeenth Amendment Vacancy Clause, however, provides just one other express limitation: the appointment lasts only "until the people fill the vacancies by election as the legislature may direct." The Seventeenth Amendment Vacancy Clause thus has a broader reach than

---

[16] We provide a blackline for easy comparison:

> . . . and if When Vacancies happen by Resignation, or otherwise in the representation of any State in the Senate, during the Recess of the Legislature of any State, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided*, That the legislature of any State may empower the Executive thereof may to make temporary Appointments until the next Meeting of the Legislature, which shall then people fill such the Vacancies by election as the legislature may direct.

*See* U.S. Const. amend. XVII para. 2; *id.* art. I § 3, cl. 2 (additions in underline, omissions in strikethrough) (capitalization differences omitted).

the Unamended Vacancy Clause, in that it applies throughout a Senate term. It is also more ambiguous than the Unamended Vacancy Clause, in that meetings of the state legislature occurred on regular schedules, whereas a popular vacancy election would not necessarily coincide with a regularly scheduled event.

Plaintiffs argue that the Seventeenth Amendment's reference to "temporary appointments" invokes a precise temporal meaning that this phrase had in the Unamended Vacancy Clause. Under the Unamended Vacancy Clause, a "temporary" appointment lasted no longer than the maximum interval between state legislative sessions. At the time that the Unamended Vacancy Clause was drafted, it appears that States held legislative sessions at least once a year. *See* Clopton & Art, *supra*, at 1211 n.119 (collecting state constitutions). As the Framers understood the provision, the maximum duration of a "temporary" appointment was thus one year.[17] *See, e.g.*, S. Rep. No. 33-385, at 1–2 (1854) (concluding that an appointed Senator's right of representation had expired upon the closing of the next legislative session following appointment). However, at the time that the Seventeenth Amendment was drafted,

---

[17] Indeed, delegates to the Philadelphia Convention doubted whether it was wise to entrust a Senate appointment power to State Governors at all, but their concerns were assuaged by assurances of this time constraint. *See* James Madison, *Notes on the Debates in the Federal Convention*, Aug. 9, 1787 ("Mr. WILSON objected to vacancies in the Senate being supplied by the Executives of the States. It was unnecessary as the Legislatures will meet so frequently. It removes the appointment too far from the people . . . . Mr. RANDOLPH thought it necessary in order to prevent inconvenient chasms in the Senate. In some States the Legislatures meet but once a year. As the Senate will have more power & consist of a smaller number than the other House, vacancies there will be of more consequence. The Executives might be safely trusted he thought with the appointment *for so short a time*.") (emphasis added).

many States held legislative sessions only every other year. *Valenti v. Rockefeller*, 292 F. Supp. 851, 864 (W.D.N.Y. 1968), *summarily aff'd*, 393 U.S. 405 (1969). The maximum duration of a "temporary" appointment then, assuming the permissible duration evolved with changing practice,[18] was therefore two years. These discrete time limits (one year or two years) are potential interpretations of the term "temporary" in the Seventeenth Amendment.[19]

However, the Seventeenth Amendment's omission of the very language from the Unamended Vacancy Clause that

---

[18] The duration of actual interim appointments did grow longer. *See Valenti*, 292 F. Supp. at 864 (finding that 32 of 179 appointees between 1789 and 1913 served for more than one year); Clopton & Art, *supra*, at 1211 n.120 (reporting based on "the aid of modern technology and more accurate sources" that only 21 pre-Seventeenth Amendment appointees served longer than one year, only one of whose tenure occurred during the first fifty years after the unamended Constitution was ratified).

[19] Plaintiffs also invite us to also interpret the term "temporary" to invoke a functional analogy between the Unamended Vacancy Clause's reference to the "next Meeting of the Legislature," and the Seventeenth Amendment Vacancy Clause's reference to "the people fill[ing] the vacancies by election as the legislature may direct." That is, the term "temporary" could carry over an implication that the election by the people to fill the vacancy must take place at the popular-election equivalent of the "next Meeting of the Legislature." Plaintiffs argue that the people are always in session. Thus, the State must hold the vacancy election as quickly as it is able to hold an orderly special election. Other functional interpretations are also possible, however, such as that the people meet when they vote in elections. Thus, the State must hold the vacancy election no later than the next election at which the people of the state are voting, which is to say any statewide election, including a special election or odd-year election. Or, the people meet in their federal political capacity when they vote for congressional representatives. Thus, the State must hold the vacancy election no later than the next congressional election, which is to say the next even-year November election.

gave the term "temporary" a precise temporal meaning suggests to us that such meaning was not retained. We think it more likely that the meaning retained by "temporary" was simply that an appointment does not definitively resolve a vacancy, but rather lasts only until the event that actually "fill[s]" the vacancy.

Plaintiffs invite us to find further meaning in the language of the Seventeenth Amendment Vacancy Clause that duplicates language in the vacancy clause governing the House of Representatives (the House Vacancy Clause). The House Vacancy Clause states:

> When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

U.S. Const. art. I, § 2, cl. 4. The Seventeenth Amendment materially replicates this language in the principal clause.[20]

The House Vacancy Clause does not specify the amount of time that may permissibly elapse between the happening of a vacancy and the vacancy election. Given the two-year term of a Representative, however, we can deduce that any

---

[20] We provide a blackline for easy comparison:

> When vacancies happen in the Representation ~~from~~ of any State in the Senate, the Executive Authority ~~thereof~~ of such State shall issue Writs of Election to fill such Vacancies~~.~~: *Provided . . .*

*See* U.S. Const. amend. XVII para. 2; *id.* art. I, § 2, cl. 4 (additions in underline, omissions in strikethrough) (capitalization differences omitted).

vacancy election must occur within a timeframe shorter than two years, and generally earlier than the next congressional election.**21** We note the judgment implicit in this requirement, that a special election is practicable on this shorter timeframe, and that a special election is worthwhile notwithstanding the limited duration of the remaining vacancy. *Accord Valenti*, 292 F. Supp. at 878 (Frankel, J., dissenting).

However, we do not think the Seventeenth Amendment Vacancy Clause should be interpreted as referencing the precise time constraints that apply in the House context, for two reasons. First, the effect of a House vacancy is different from that of a Senate vacancy. When a vacancy occurs in the House, the affected district has no representation in the House until the State certifies a winner of the special election. The House Vacancy Clause contains no provision for an interim appointee. By contrast, when a vacancy happens in the Senate, the affected state is normally still represented by a second elected Senator, as well as potentially by an interim appointee. The election of a replacement Representative is thus in some sense more urgent than the election of a replacement Senator. *Accord*

---

**21** Plaintiffs' reliance on *Jackson v. Ogilvie*, 426 F.2d 1333 (7th Cir. 1970), and *ACLU v. Taft*, 385 F.3d 641 (6th Cir. 2004), for the proposition that the House Vacancy Clause requires a special election as soon as practicable is misplaced. Both of those cases were concerned with whether the House Vacancy Clause mandates a special election at all, even with little time left in the vacant term. *See Jackson*, 426 F.2d at 1334; *ACLU*, 385 F.3d at 644. Both held that it does, so long as the remaining time is not truly de minimis. *See Jackson*, 426 F.2d at 1337; *ACLU*, 385 F.3d at 650. Both held further that the lame-duck session is not de minimis. *See Jackson*, 426 F.2d at 1337; *ACLU*, 385 F.3d at 649 n.5. But neither pronounced a time constraint that would require a special election earlier than the next general election.

*ACLU*, 385 F.3d at 649 n.3; *Valenti*, 292 F. Supp. at 862–63 (majority opinion).  Conversely, however, the election of a replacement Senator is uniquely urgent in the sense that the Constitution prizes the equal representation of the States. *See* U.S. Const. art. V ("[N]o state, without its consent, shall be deprived of its equal suffrage in the Senate.").

Second, as a practical matter, most States can likely conduct a special election more easily for a single congressional district than for an entire state.  Most congressional districts are smaller than their entire states in terms of both geography and population.[22]  Thus, House special elections generally require fewer polling places, fewer ballot materials, and a smaller elections staff.  There may also be a smaller field of candidates, and candidates may be able to campaign more quickly.  Accordingly, there is reason to think the Seventeenth Amendment Vacancy Clause may allow a longer interval before the people fill the vacancy by election than does the House Vacancy Clause. *Accord Valenti*, 292 F. Supp. at 862–63.

Finally, Plaintiffs argue that the final words of the Seventeenth Amendment Vacancy Clause ("as the

---

[22] Currently, seven states have only one congressional district: Alaska, Delaware, Montana, North Dakota, South Dakota, Vermont, and Wyoming.  U.S. Census Bureau, *Apportionment Population and Number of Representatives, by State: 2010 Census*, https://www.census.gov/population/apportionment/files/Apportionment%20Population%202010.pdf.  When the Seventeenth Amendment was ratified, five states had only one congressional district: Arizona, Delaware, Nevada, New Mexico, and Wyoming.  Apportionment Act of 1911, Pub. L. No. 62-5, 37 Stat. 13 (1911).  When the original Constitution was ratified, two of the thirteen original states were apportioned only one congressional district pending the first census: Delaware and Rhode Island.  U.S. Const. art. I, § 2, cl. 3.

legislature may direct") are a cross-reference to the Elections Clause, which states:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

U.S. Const. art. I, § 4, cl. 1.  We need not resolve this question, as we would disagree in any event with Plaintiffs' argument that such a cross-reference independently imposes a time constraint on the vacancy election. *Cf. United States v. Classic*, 313 U.S. 299, 311 (1941) ("Pursuant to . . . [the Elections Clause] . . . , the states are given, and in fact exercise a wide discretion in the formulation of a system for the choice by the people of representatives in Congress.").

In sum, we do not find that related constitutional provisions place any precise temporal limitations upon vacancy elections or appointments under the Seventeenth Amendment.

### 3.  Historical Context

We next reflect upon the broader historical context and the public spirit of the moment that motivated the drafting and ratification of the Seventeenth Amendment.  As drafted in 1787, the original U.S. Constitution provided for two chambers of the national legislature elected in two different ways.  While members of the House of Representatives were to be elected "by the People," U.S. Const. art. I, § 2, cl. 1, Senators were to be "chosen by the [State] Legislature," U.S. Const. art. I, § 3, cl. 1.  The Framers had at least two

motivations for designing the Senate in this way: (a) to secure the role of state governments in the new federal government, and (b) to balance the directly elected House with a legislative chamber comprising a more "select appointment." *The Federalist No. 62* (James Madison).[23]

Congressional proposals to amend the Constitution in favor of the direct election of Senators began within Madison's lifetime. *See* Clopton & Art, *supra*, at 1189 n.17 (collecting proposals as early as 1826). At least four motivations drove the reformers: (1) curbing corrupt practices in the choosing of Senators, such as bribery and control by party bosses;[24] (2) freeing state legislatures from the distraction and distorting effects of being responsible for choosing national representatives;[25] (3) avoiding deadlocks

---

[23] *See also* James Madison, *Notes on the Debates in the Federal Convention*, June 6, 1787 ("Mr. SHERMAN: If it were in view to abolish the State Govts. the elections ought to be by the people. If the State Govts. are to be continued, it is necessary in order to preserve harmony between the National & State Govts. that the elections to the former shd. be made by the latter."); George H. Haynes, *The Election of Senators* 1–18 (1906) (canvassing the debates that took place at the 1787 Philadelphia convention regarding the composition of the Senate, noting that the device of election by state legislatures was widely popular and was the device by which the delegates had themselves been selected).

[24] *See, e.g.*, H.R. Rep. No. 55-125, at 3 (1898) ("The public press for years . . . has been teeming with legislative scandals in the election of Senators, until bribery and corruption are, we fear, in some localities, fast becoming recognized as a part of the legislative function . . . .") (quoting H.R. Rep. No. 52-368, at 3 (1892)); Haynes, *supra* note 23, at 169–79; Jay S. Bybee, *Ulysses at the Mast: Democracy, Federalism, and the Sirens' Song of the Seventeenth Amendment*, 91 Nw. U. L. Rev. 500, 536–41 (1997).

[25] *See* Haynes, *supra* note 23, at 180–95.

that left states unrepresented;[26] and (4) giving the people a greater voice in their own government.[27] This last motivation was primary. In the words of then-Professor, now Judge Jay S. Bybee:

> [W]hile corruption and legislative deadlock might have demanded reform, neither justified amending the Constitution. . . . In the end analysis, . . . the real justification for the Seventeenth Amendment was its populist appeal, a need to "awaken[] in the Senators . . . a more acute sense of responsibility to the people." The people simply wished to elect senators themselves, without the mediation of their state representatives. William Jennings Bryan argued that "[i]f the people of a State have enough intelligence to choose their representatives in the State legislature . . . , they have enough intelligence to choose the men who shall represent them in the United States Senate." Whatever the reasons for the original mode of selection, the voters were "a new people living and acting under an old system." In the proponents' view, the Senate had been "a sort of aristocratic body— too far removed from the people, beyond their reach, and with no especial interest in their welfare." For populists and

---

[26] *See id.* at 158–60, 195–96; Bybee, *supra* note 24, at 541–44.

[27] *See* Haynes, *supra* note 23, at 131–32, 153–58, 166–69, 200–03; Bybee, *supra* note 24, at 544–47.

> progressives, election by the legislature was
> an anachronism[.]

Bybee, *supra* note 24, at 544 (footnotes omitted) (first quoting H.R. Rep. No. 50-1456, at 2 (1888); second quoting 26 Cong. Rec. 7775 (1893); third quoting 28 Cong. Rec. 1519 (1896) (statement of Sen. Turpie); fourth quoting S. Rep. No. 54-530, at 10 (1896)).

By the first decade of the twentieth century, a majority of state legislatures supported and had to some extent already implemented the popular election of Senators. *See* Richard Albert, *The Progressive Era of Constitutional Amendment*, 2 Revista de Investigações Constitucionais 35, 46–48 (2015). Having received House approval numerous times in various versions, the soon-to-be Seventeenth Amendment finally received Senate approval in 1911. H.J. Res. 39, 62d Cong., 47 Cong. Rec. 1879–1925 (1911). The House accepted the Senate's version in 1912, 37 Stat. 646 (1912), and three quarters of the States had ratified the Amendment by mid-1913, 38 Stat. 2049 (1913).

Reading the Seventeenth Amendment Vacancy Clause in the context of its primary historical purpose, we think that the people are generally more empowered the more of a Senate term they are permitted to fill by election. Representation by a temporary appointee is some representation, but it is indirect representation only, of precisely the type the Seventeenth Amendment meant to substantially replace. However, the people may also suffer a loss of empowerment to the extent the vacancy election occurs too close in time to when the vacancy happened, if a too-quick schedule means the people are deprived of a meaningful choice among candidates. But beyond the amount of time that it takes to hold an orderly election, we

think that the popular purpose of the Seventeenth Amendment counsels interpreting it to minimize the interval preceding the vacancy election and likewise the duration of appointed representation.

As to the secondary concerns that motivated reformers, we note that corrupt practices are a heightened risk where there is only one decisionmaker (e.g. the Governor) rather than a large body of them (e.g. the State legislature). This risk was illustrated recently by Governor Blagojevich's attempt to sell President-elect Obama's vacant Senate seat. *See Judge I*, 612 F.3d at 541; Monica Davey & Emma G. Fitzsimmons, *Ex-Governor Found Guilty of Corruption*, N.Y. Times, June 28, 2011, at A1. Thus, the shorter the tenure of an appointee, the shorter may be the time that a corruptly appointed Senator serves, and perhaps the less attractive will be the appointment to corrupt actors. We think the Seventeenth Amendment satisfies the overburdened legislature and legislative deadlock concerns regardless of the length of a temporary appointment.

Thus, our review of the historical context leads us to disfavor any interpretation that permits excessively long vacancies, but still does not reveal any precise constraints.

### 4.  Congressional Understanding

Plaintiffs cite remarks by the Senator who proposed the final version of the Seventeenth Amendment in the Senate, and by the Representative who authored the Vacancy Clause's final text in the context of a previous version of the Seventeenth Amendment introduced in the House, as supporting their interpretation of the Amendment. We disagree. We conclude that the cited reports are ambiguous as to the relevant questions.

Senator Joseph L. Bristow[28] proposed the final version of the Seventeenth Amendment in the Senate. In his remarks on the Senate floor, he briefly explained the drafting of the Vacancy Clause. Regarding the principal clause, he emphasized that he had "use[d] exactly the same language in directing the governor to call special elections for the election of Senators to fill vacancies that is used in the Constitution in directing him to issue writs of election to fill vacancies in the House of Representatives." 47 Cong. Rec. 1482–83 (1911). Regarding the proviso, he noted "[t]hat it is practically the same provision which now exists in the case of such a vacancy. . . . [T]he legislature may empower the governor of the State to appoint a Senator to fill a vacancy until the election occurs, and he is directed by this amendment to 'issue writs of election to fill such vacancies.'" *Id.* These statements align with our conclusions regarding the text and constitutional context discussed above. They do not, however, illuminate whether legislators understood the final language to require that the necessary "special election" must "occur[]" by a particular time. *Id.*

Representative Henry St. George Tucker III[29] authored an 1892 proposed version of the Seventeenth Amendment,

---

[28] Senator Bristow (R-Kan.) was a former newspaper editor who devoted his political career to progressive reform, particularly with respect to popular participation in government. *See* U.S. Senate, *Joseph L. Bristow: A Featured Biography*, https://www.senate.gov/senators/FeaturedBios/Featured_Bio_Bristow.htm.

[29] Representative Tucker (D-Va.) was a constitutional law scholar who would later serve as dean of the law schools of Washington and Lee University and George Washington University. *See* Biographical Directory of the U.S. Cong., *Tucker, Henry St. George*, http://bioguide.congress.gov/scripts/biodisplay.pl?index=T000399.

from which the final version of the Amendment borrowed the language in the Vacancy Clause (omitting one comma). Representative Tucker's authorship received express acknowledgement during the Senate debates on the final version.  46 Cong. Rec. 2940 (1911).  We therefore find Representative Tucker's explanation of his language to be relevant here.   In explaining his proposed language, Representative Tucker justified the principal clause, under which "the governor *must* order an election to fill the vacancy," as "preserv[ing] the principle of election by the people."   H.R. Rep. No. 52-368, at 5 (1892) (emphasis added).   He justified the proviso as responding to the predicament of those States that have "*annual* elections," where any vacancy would therefore "in most cases not be of long duration, and to add another State election would be imposing an unnecessary expense on the people."   *Id.* (emphasis added).  He went on to suggest that:

> . . . in a State where there are biennial elections the legislature might direct that if a vacancy occurred within a year [or any other period it might fix] after the election, the vacancy should be filled by an election by the people; but if the vacancy occurred more than a year after the election the vacancy should be filled by executive appointment.

*Id.* (brackets in original).   In context, we read this explanation to suggest that a state legislature would have discretion to direct that any vacancy occurring within the "period it might fix" be filled by prompt special election, but that any vacancy occurring thereafter be filled at the next general election, with a temporary appointee serving in the interim.

We conclude that Representative Tucker's report evinces a strong assumption that States would fill most Senate vacancies by popular election within one year of their occurrence.    However, we are less confident that Representative Tucker's report evinces any assumption that the proposed Vacancy Clause would *require* observance of this one-year limit.  Rather, his report suggests that although the principal clause would require a special election (even sooner than one year) standing alone, the proviso defeats this requirement by leaving some discretion to state legislatures. The report does not anticipate the possibility that States with biennial elections might direct that a prompt special election is never required, postponing the people's ability to fill the vacancy until the next general election no matter how near the previous election the vacancy arose.  But neither does the report offer an interpretation of the proviso that would clearly prohibit this.

The legislative history thus does not provide us with a clear view of the textual interpretation possessed by the members of Congress who voted in favor of the Seventeenth Amendment.

### 5.   State Legislature Interpretations

Defendants draw our attention to the Senate vacancy statutes enacted by most state legislatures shortly after the Seventeenth Amendment's ratification.  Defendants argue that these statutes demonstrate that the correct interpretation of the Vacancy Clause is one that permits a vacancy election at the next even-year election, or the second even-year election if the vacancy happens within some months of the first one. *See Valenti*, 292 F. Supp. at 858–59 (where there is ambiguity or doubt, contemporaneous and subsequent state practice is persuasive evidence of the best constitutional construction) (citing *McPherson v. Blacker*,

146 U.S. 1 (1892); *Smiley v. Holm*, 285 U.S. 355 (1932)). We agree that these statutes provide persuasive evidence in favor of this conclusion. However, we note several caveats.

Forty States enacted Senate vacancy statutes between 1913 and 1915. *See Valenti*, 292 F. Supp. at 857 tbl.1, 871–75 (App'x B). Nineteen States specifically required—whether expressly by reference to biennial or congressional elections, or implicitly by reference to the state's general elections—that vacancy elections take place at the next even-year election.[30] Four States required that vacancy elections take place at the next even-year election following some additional time for nominations.[31] Four States required that vacancy elections take place at the next annual election.[32] Eight States required a special election within less than one year of the start of the vacancy.[33] The

---

[30] *See* Ariz. Rev. Stat. § 12-2870 (1913) (but authorizing Governor to call special election if this would result in lapse of over six months); 1913 Cal. Stat. 237 (but requiring vacancy election during any statewide special election if sooner); 1913 Fla. Laws 277; 1913 Ga. Laws 135; 1913 Ill. Laws 307; 1915 Ind. Acts 13; 1914 Ky. Acts 98; 1915 Mich. Pub. Acts 261; 1913 Minn. Laws 756; 1915 Mont. Laws 281; 1915 Nev. Stat. 83; 1915 N.H. Laws 32; 1915 Okla. Sess. Laws 57; 1915 S.D. Sess. Laws 367; 1913 Tenn. Pub. Laws 396; 1915 Utah Laws 54; 1915 Vt. Acts & Resolves 70; 1913 Wis. Sess. Laws 825 (but authorizing Governor to call special election sooner); 1913 Wyo. Sess. Laws 100.

[31] *See* 1915 N.M. Laws 39 (30 days); 1913 N.C. Sess. Laws 206 (30 days); 1914 Ohio Laws 8 (180 days); 1913 Pa. Laws 995 (60 days in advance of the primary).

[32] *See* 1913 Colo. Sess. Laws 267; 1914 Md. Laws 1337; 1913 N.Y. Laws 2419 (plus 30 days); 1914 Va. Acts 252.

[33] *See* 1915 Ala. Laws 364 (60 days, or 4 months if upcoming general election); Del. Rev. Code § 1890 (1915) (one year); 1914 La. Acts 471 (100 days); 1915 Me. Laws 35 ("forthwith"); 1914 Miss. Laws

remaining five States did not set a deadline but appear to have left the timing of vacancy elections entirely or primarily to the Governor's discretion.[34]

The number of state legislatures apparently interpreting the Seventeenth Amendment to afford them discretion to postpone a Senate vacancy election for up to two years or slightly more is persuasive evidence that this interpretation reflects the original public understanding. Even the statutes providing for special elections within thirteen months or less do not necessarily evince an interpretation that the state legislature *lacked discretion* to postpone the election longer.[35] Nor can we entirely dismiss the interpretations of contemporary state legislatures as coming from the political bodies that the Seventeenth Amendment had just divested of power. The majority of state legislatures supported some form of the Seventeenth Amendment, and many had already implemented state-level reforms to create de facto direct election of Senators. Albert, *supra*, at 46–48.

But we also do not find the state statutes conclusive as to the proper interpretation of the Seventeenth Amendment Vacancy Clause. The evidence we have examined in this portion of our analysis tells us no more than that twenty-

---

192 (90 days, or calendar year of general election); 1914 R.I. Pub. Laws 65 ("as early . . . as will admit of compliance with . . . law"); 1914 S.C. Acts 592 (90 days); 1913 Tex. Gen. Laws 101 (90 days).

[34] *See* 1913 Conn. Pub. Acts 1839; 1913 Mass. Acts 1059; 1915 Mo. Laws 280; 1915 Or. Laws 59; 1915 Wash. Sess. Laws 232 (not less than 25 days from issuance of writ).

[35] Indeed, many States that originally provided for prompt special elections later amended their statutes to postpone vacancy elections until the next even-year election. *See Valenti*, 292 F. Supp. at 857 tbl.1, 871–75 (App'x B).

three state legislatures enacted statutes in the wake of the Seventeenth Amendment's ratification that postponed a vacancy election to the next (or next practicable) even-year election. We do not know the extent to which that choice represented the state legislatures' debate or deliberation, as opposed to uncontested assumption, regarding the meaning of the Seventeenth Amendment. We do not know how state or federal courts might have interpreted the Seventeenth Amendment if those statutes had occasioned contemporary challenges.[36] *Cf. U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 823 (1995) ("One may properly question the extent to which the States' own practice is a reliable indicator of the contours of restrictions that the Constitution imposed on States, especially when no court has ever upheld [the challenged state practice]."). And we do not know whether the state legislatures that enacted speedier special election laws may have specifically interpreted the Seventeenth Amendment to so require. We do note that we have no example within contemporary state practice—or any subsequent state practice—of a State attempting to extend a vacancy or interim appointment by significantly more than the two-year gap between even-year elections.

In sum, postratification state statutes favor, but do not compel, an interpretation of the Seventeenth Amendment Vacancy Clause that leaves States broad discretion to schedule a vacancy election up until the next general election preceded by some reasonable period of time in which to hold the election.

---

[36] We do know that many state courts had interpreted similar vacancy provisions in their own state constitutions to require prompt special elections. *See Valenti*, 292 F. Supp. at 883 (Frankel, J., dissenting) (collecting cases).

### 6.  Precedent

We now turn to the four prior cases that have interpreted the Seventeenth Amendment Vacancy Clause at any length. We begin with *Valenti* and *Rodriguez*, and proceed to two related decisions decided by our sister circuits in the interim.

### i.   *Valenti v. Rockefeller*

On June 5, 1968, U.S. Senator and presidential candidate Robert F. Kennedy was fatally shot in the kitchen of the Ambassador Hotel in Los Angeles.  Pursuant to then-applicable New York law, the vacancy created by Senator Kennedy's assassination occurred too close to that year's Senate primaries to let the people of New York fill the vacancy by election in November 1968. 292 F. Supp. at 853. Instead, the law permitted the vacant seat to go unfilled by popular election until November 1970—an interval of 29 months. *See id.*  Multiple plaintiffs challenged New York's Senate vacancy statute and moved for an injunction ordering New York to hold a vacancy election in November 1968— i.e., five months from when the vacancy occurred. *Id.*  In *Valenti*, a divided three-judge district court[37] dismissed the complaints.  *Id.*

---

[37] At the time of *Valenti*, Congress required that any case seeking an injunction against a state officer to prevent enforcement of an allegedly unconstitutional state statute be heard by a special three-judge district court.  28 U.S.C. § 2281 (1964) (repealed 1976).  One member of the specially constituted court had to be a circuit judge.  *Id.* § 2284(1).  The decision of the three-judge court was directly appealable to the Supreme Court.  *Id.* § 1253.  *See generally* 17A Charles Alan Wright, Arthur R. Miller & Vikram David Amar, *Federal Practice and Procedure* § 4234 (3d ed., Aug. 2019 update) (tracing history of the three-judge district court from Congress's reaction to *Ex Parte Young*, 209 U.S. 123 (1908),

All three judges on the panel agreed that the final words of the proviso ("as the legislature may direct") grants "some reasonable degree of discretion" to state legislatures to determine the timing of a Senate vacancy election. *Id.* at 856; *id.* at 884 (Frankel, J., dissenting). They also all agreed that the word "temporary" could not "faithfully be read to allow appointments for anything approaching the full six years in the case of a vacancy occurring early in the term." *Id.* at 881. They nevertheless disagreed regarding the outer boundaries of the State's discretion, as well as regarding what evidence is relevant to answer that question.

Writing for the majority, Second Circuit Chief Judge Lumbard[38] divided the relevant inquiry into two parts: (1) whether the Seventeenth Amendment permitted New York to skip the upcoming election—i.e., November 1968—and (2) whether the Seventeenth Amendment permitted New York to skip the next odd-year election—i.e., November 1969. *See id.* at 855 (majority opinion). He answered both questions in the affirmative. As to the first, he emphasized the State's interest in holding primary elections, which he implied outweighed the people's interest in a prompt special election. *Id.*; *see also id.* at 861–62 (emphasizing the virtues of primary elections). As to the second, he focused on the probative value of state statutes enacted shortly after the Seventeenth Amendment's ratification, as we discussed above. *Id.* at 856–59. He also posited three "substantial state interests" as justifying a generous interpretation of the discretion the Amendment grants to state legislatures:

to the Supreme Court's frustration with the practice peaking in the late 1960s and early 1970s, to the "virtual abolition" of the practice in 1976).

[38] Chief Judge Lumbard was joined by Chief District Judge Henderson of the Western District of New York.

(a) capitalizing on maximum voter interest and turnout during even-year elections; (b) making it easier for Senate candidates to finance their campaigns; and (c) avoiding the inconvenience and expense associated with Senate elections in back-to-back years.  *Id.* at 859–60.**[39]**

---

**[39]** Dissenting, Judge Frankel of the Southern District of New York criticized the majority for its "almost total disregard" of the Seventeenth Amendment's primary mandate that Senators be "elected by the people." *Id.* at 875–76 (Frankel, J., dissenting).  He would have held that the Amendment contains a "powerful presumption" than an appointment ought last no longer than one year, and that "the most impressive kind of justification" is necessary to exceed it.  *Id.* at 889 (adding that the appointment at issue, substantially exceeding two years, was "patently excessive").  In support of this conclusion he drew on textual comparison to and historical practice under the Unamended Vacancy Clause.  *See id.* at 876–77.  He also drew on textual comparison to the House Vacancy Clause, legislative history, and numerous state court interpretations of similar legislative vacancy provisions in those states' own constitutions. *See id.* at 877–84.

Judge Frankel objected to the majority's reliance on state practice, citing several then-recent Supreme Court decisions that invalidated state statutes under newly announced constitutional interpretations despite clearly contrary state interpretations at the time of ratification.  *Id.* at 887 (citing *Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Brown v. Board of Education*, 347 U.S. 483 (1954)).

Judge Frankel further argued that it was perverse to have a "substantial state interest" in increased voter turnout lead to an interpretation that did not allow *anyone* to vote for over two years.  *Id.* He criticized the majority's arguments about the "expense" of a special election, noting, for instance, that such expense could hardly be prohibitive.  *Id.* at 888.  He argued that Representative Tucker's report interpreted the operative language to justify delay for expense reasons if and only if the vacancy election would otherwise take place within the same year as an already scheduled general election.  *Id.* (citing H.R. Rep. No. 52-368, at 5 (1892)).

On direct appeal, the Supreme Court summarily affirmed the *Valenti* majority. 393 U.S. 405 (1969) (per curiam). Accordingly, *Valenti* binds us as to the result, although not the reasoning, of the district court decision. In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), the Supreme Court explained:

> We have often recognized that the precedential effect of a summary affirmance extends no further than 'the precise issues presented and necessarily decided by those actions.' A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain the judgment.

*Id.* at 784 n.5 (citation omitted) (quoting *Ill. Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 182–83 (1979)); *see also id.* at 784–85 ("Then, correctly recognizing the limited precedential effect to be accorded summary dispositions, the Court of Appeals independently reached the same conclusion.") (footnote omitted); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979) ("It is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action.").

The parties dispute the nature of "the precise issues" that were "necessarily decided" by the Court's summary affirmance in *Valenti*. *Anderson*, 460 U.S. at 784 n.5 (quoting *Ill. Elections Bd.*, 440 U.S. at 182–83). Plaintiffs would have us limit the precedential effect of *Valenti* to the denial of the injunction sought by the *Valenti* plaintiffs, i.e., the five-month timetable. Defendants would have us read

the affirmance broadly as authorizing the delay of a popular election until November 1970, i.e., the full 29-month interval. Our resolution of this dispute turns on our interpretation of *Rodriguez*.

## ii. *Rodriguez v. Popular Democratic Party*

In 1981, Puerto Rico House of Representatives member Ramón Muñiz (Popular Democratic Party) died and left vacant his seat in the commonwealth legislature. 457 U.S. at 3. At the time, Puerto Rico law allowed the vacating legislator's political party to fill the vacancy by appointment for the remainder of the term, in this case nearly the full four-year term. *See id.* at 3–5 & n.2 (citing P.R. Laws Ann., Tit. 16, §§ 3206, 3207 (Supp. 1980)). The Governor of Puerto Rico, a member of the opposition New Progressive Party, instead called a special election open to all qualified voters. *Id.* at 3. In the lawsuit that ensued, the U.S. Supreme Court was called upon to decide whether the Puerto Rico vacancy law violated the U.S. Constitution. *Id.* It unanimously held that it did not. *Id.*

The Court interpreted the question before it as whether, given that Puerto Rico allows its people to elect legislators by popular vote at each general election, the U.S. Constitution prevents it from filling vacancies during the interim periods only by appointment.[40] It rejected arguments that either the Qualifications Clause, U.S. Const. art. I, § 2, cl. 1 (referencing the "Electors of the most numerous Branch of the State Legislature"), the Guarantee

---

[40] The Court separately addressed the question of whether that appointment could be delegated to a political party. *See id.* at 12–14. It affirmed the finding of the Supreme Court of Puerto Rico that this "was a legitimate mechanism serving to protect the mandate of the preceding election." *Id.* at 13.

Clause, U.S. Const. art. IV, § 4 (guaranteeing "to every State in this Union a Republican Form of Government"), or the Fifth or Fourteenth Amendment equal protection guarantees so prohibit. *See id.* at 8–10 & n.8.

Instead, the Court found support for Puerto Rico's appointment procedure by analogizing to the Seventeenth Amendment. *See id.* at 10–12. The Court observed that in *Valenti* it had "sustained the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment pending the next regularly scheduled congressional election—in that case, a period of over 29 months." [41] *Id.* at 10–11 (citing 393 U.S. 405). The Court then reasoned that:

> . . . the fact that the Seventeenth Amendment permits a state, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that [neither] a state [nor Puerto Rico] is . . . constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature.

---

[41] We acknowledge that both sides' briefing in *Rodriguez* simply assumed that the Court's summary affirmance of *Valenti* had endorsed the full 29-month delay of a vacancy-filling election. *See* Brief for Appellants at 22 n.14, 457 U.S. 1 (1982) (No. 81-328); Brief for Appellees at 23–25, 457 U.S. 1 (1982) (No. 81-328); Reply Brief for Appellants at 6–7, 11, 457 U.S. 1 (1982) (No. 81-328). Rather than challenging this interpretation, the appellants tried to distinguish *Valenti* as upholding an appointment lasting "less than half" the term, in contrast to nearly the entire term as in the case at hand. Brief for Appellants, *supra*, at 22 n.14.

*Id.* at 11.  The Court also quoted with approval the *Valenti* district court's assessment that the case involved "no fundamental imperfection in the functioning of democracy," but "only the unusual, temporary, and unfortunate combination of a tragic event and a reasonable statutory scheme." *Id.* at 11 (quoting 292 F. Supp. at 867).

The parties dispute whether *Rodriguez*'s discussion of *Valenti* was dicta or holding, given that the Seventeenth Amendment does not apply to Puerto Rico and the vacancy at issue was not in the U.S. Senate.  Even if it is mere dicta, however, we do not believe we are free to ignore it.  *See Zal v. Steppe*, 968 F.2d 924, 935 (9th Cir. 1992), as amended (July 31, 1992) (Noonan, J., concurring in the result in part and dissenting in part) ("[D]icta of the Supreme Court have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold.  We should not blandly shrug them off because they were not a holding.").  Moreover, we think that *Rodriguez*'s discussion of *Valenti* has even greater weight, because we cannot say with certainty that the Court would have reached the same conclusion regarding Puerto Rico's appointment scheme without the analogy to *Valenti*'s approval of a 29-month Senate appointment.  Furthermore, an interpretation of the Seventeenth Amendment Vacancy Clause that grants States as much as 29 months in which to schedule a vacancy election at their discretion is not unreasonable in light of our foregoing analysis.  We therefore conclude that we are bound by *Rodriguez*'s 29-month interpretation of the binding result of *Valenti*.[42]

---

[42] Plaintiffs argue that *U.S. Term Limits* and *Cook v. Gralike*, 531 U.S. 510 (2001) herald an intervening doctrinal shift that more narrowly circumscribes state discretion.  In *U.S. Term Limits*, the Court prohibited

### iii. *Trinsey v. Pennsylvania*

On April 4, 1991, Pennsylvania Senator H. John Heinz III's privately chartered plane collided with a helicopter in midair. The aircraft crashed into the yard of an elementary school, killing Senator Heinz along with the pilots and two first-grade girls who had been at recess.[43]  Then-operative Pennsylvania law required a vacancy election at the next general or municipal election occurring at least 90 days after the happening of the vacancy, which meant November 1981. 941 F.2d at 225.  In contrast to Pennsylvania's approach to general elections, the law did not provide for primaries before the vacancy election, but instead allowed the major political parties to nominate candidates in accordance with their own party rules.  *Id.* at 225–27.  A Philadelphia

the State of Arkansas from denying ballot access to congressional candidates who had served a certain number of terms in Congress.  514 U.S. at 783.  The Court concluded that the Constitution prohibits States from imposing congressional qualifications additional to those therein enumerated, emphasizing that to allow otherwise would violate the "fundamental principle of our representative democracy . . . 'that the people should choose whom they please to govern them.'"  *Id.* at 783, 793, 795, 819 (quoting *Powell v. McCormack*, 395 U.S. 486, 547 (1969)).  In *Cook*, the Court prohibited the State of Missouri from attempting to circumvent *U.S. Term Limits*—under the guise of the State's authority to regulate the "Manner of holding Elections," U.S. Const. art. I, § 4, cl. 1—by printing adverse labels next to the names of congressional candidates who had not pledged or taken action to support a term limits amendment to the U.S. Constitution.  531 U.S. at 522–26.  Even assuming these cases represent a doctrinal shift relevant to our decision today, it would be the Supreme Court's prerogative, not ours, to resolve potentially conflicting lines of its own doctrine.  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *In re Twelve Grand Jury Subpoenas*, 908 F.3d 525, 529 (9th Cir. 2018).

[43] Don Phillips & Michael Specter, *Sen. Heinz Dies in Plane Crash*, Wash. Post, Apr. 5, 1991, at A1.

developer and would-be Republican Senate candidate sued pro se after reading the Seventeenth Amendment in his home encyclopedia, arguing that nominations must be made "by the people."[44]  *Id.* at 226–27.  On appeal of the district court judgment for the developer, the Third Circuit reversed.  *Id.* at 236.  The Supreme Court denied certiorari.  502 U.S. 1014 (1991).

The Third Circuit began by canvassing the Seventeenth Amendment's legislative history for discussion of primary elections.  *See* 941 F.2d at 228–31.  It concluded that Congress had deliberately omitted to require a particular process for nominating Senate candidates for general elections, but that the record revealed little consideration of the issue with regard to vacancy elections.  *Id.* at 230–31.  Although presented with the "converse" of the situation here—essentially, the claim that the State was holding the vacancy election too *soon*—the court then relied heavily on *Valenti* and *Rodriguez* for the proposition that the Seventeenth Amendment confers "a reasonable discretion upon the states concerning the timing and manner of conducting vacancy elections."  *Id.* at 233 (quoting *Valenti*, 292 F. Supp. at 866).[45]  Having found nothing in legislative

---

[44] *See* David Treadwell, *Senate Hopeful's Suit Puts Pennsylvania in Turmoil: Novice says the people, not the parties, must choose candidates*, L.A. Times (June 20, 1991), https://www.latimes.com/archives/la-xpm-1991-06-20-mn-1437-story.html. The Third Circuit appointed Professor Laura E. Little of Temple University School of Law as amicus curiae to "fully and forcefully" present the position adverse to that of the State. *Trinsey*, 941 F.2d at 227.

[45] The Third Circuit distinguished two Supreme Court cases specifically regarding primary elections, holding that those cases governed only citizens' rights respecting a primary election that the state has chosen to hold, and did not establish a right to have the state hold a

history or caselaw to support a constitutional requirement that States hold primaries before vacancy elections, the Third Circuit concluded that no fundamental right was infringed by the Pennsylvania statute. *Id.* at 234. It therefore rejected the district court's application of strict scrutiny, and concluded that *Rodriguez* counsels toward "a more deferential standard of review." *Id.* *Trinsey* is generally consistent with our foregoing analysis.

### iv. *Judge v. Quinn*

On November 4, 2008, then-Senator Barack Obama was elected President of the United States. He resigned his Senate seat twelve days later, with nearly two years and two months remaining in the term. 612 F.3d at 541. Illinois law provided that a Senate vacancy be filled at the next congressional election (i.e., November 2010), with the Governor making a temporary appointment in the interim. *Id.* Governor Rod Blagojevich appointed former State Attorney General Roland Burris to serve as Senator until the vacancy was "filled by election as provided by law," but did not issue a writ of election. *Id.* Shortly thereafter, Governor Blagojevich, whose private phone calls the FBI had all the while been recording, was impeached, removed from office, criminally indicted, and eventually convicted on charges including attempting to "obtain personal financial benefits . . . in return for his appointment of a United States Senator." Superseding Indictment at 16, *United States v. Blagojevich*, No. 08 CR 888-1 (N.D. Ill. Apr. 2, 2009); *see Judge I*, 612 F.3d at 541; Davey & Fitzsimmons, *supra*, at A1.

---

primary election. *See id.* at 231–32 (discussing *United States v. Classic*, 313 U.S. 299 (1941), and *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)).

Two registered voters sued the successor Governor for an alleged violation of their Seventeenth Amendment rights. *Judge I*, 612 F.3d at 541. As ultimately presented to the Seventh Circuit, the plaintiffs challenged the Governor's failure to issue a writ of election fixing *any* date for the people to fill the vacancy. *Id.* at 543. Without such a writ, the November 2010 election would fill only the subsequent Senate term beginning in 2011. With a writ, the November 2010 election could also fill the remaining few weeks (i.e., the "lame-duck" session) of the Obama term.

In *Judge I*, the Seventh Circuit concluded that the Seventeenth Amendment makes mandatory the Governor's duty to issue a writ of election. *Id.* at 555. In *Judge II*, the Seventh Circuit clarified that the district court had authority to issue an injunction requiring the Governor to do just that, regardless of Illinois statutory law. 387 F. App'x at 630. The Supreme Court denied certiorari. 563 U.S. 1032 (2011). In *Judge III*, the Seventh Circuit upheld the district court's injunction ordering the Governor to call a special election on election day in November 2010, and to name as candidates to fill the lame-duck session of the Obama vacancy the same candidates running for the subsequent Senate term. 624 F.3d 352, 354, 356, 362 (7th Cir. 2010). The Supreme Court again denied certiorari. *Burris v. Judge*, 563 U.S. 1041 (2011).

Although *Rodriguez* had interpreted *Valenti* to authorize a State "to forgo a special election in favor of a temporary appointment," 457 U.S. at 11, the Seventh Circuit concluded that *Valenti* did not provide "firm guidance" for its analysis. *Judge I*, 612 F.3d at 548–49. Assuming without deciding that the *Valenti* summary affirmance endorsed the full 29-month lapse in elected representation, the Seventh Circuit concluded that *Valenti* nevertheless "had nothing to say

about" and "could not have decided" the question whether the Seventeenth Amendment mandates the issuance of a writ of election. *Id.* at 549 (noting that the Governor of New York had already issued a writ of election for November 1970). We agree with the Seventh Circuit on this point, and conclude that the "forgo a special election" language in *Rodriguez* is fairly read to refer to elections falling outside the general election cycle, rather than to vacancy elections altogether. We add that neither *Valenti* nor *Rodriguez* articulate any rationale for concluding that temporary appointments are an alternative to *ever* holding a vacancy election, or that state discretion to "direct" a vacancy election encompasses discretion to "forgo" a vacancy election. We therefore interpret *Rodriguez* to endorse only a State's discretion to *postpone* a vacancy election *until* a general election.

## B. Application to A.R.S. § 16-222

We turn at last to the challenged law. Under the schedule set by A.R.S. § 16-222(D) and Governor Ducey's writ of election consistent therewith, Arizona's lapse between the occurrence of the vacancy and the vacancy election exceeds the full two-year interval between congressional election voting days by about two and a half months.[46] In *Valenti*, New York's lapse exceeded the same interval by about five months. Because Arizona's additional lapse does not exceed the additional lapse endorsed by *Valenti* and *Rodriguez*, we hold that the timing provision of A.R.S. § 16-222(D) as applied to the McCain vacancy is a permissible exercise of

---

[46] Although A.R.S. § 16-222(D) provides for as much as seven months of additional time, no such vacancy election schedule is before us. We therefore need not fully resolve the outer boundaries of the Seventeenth Amendment's permissible schedule.

the State's discretion under the Seventeenth Amendment. Likewise, then, neither Governor Ducey's writ of election nor Senator McSally's appointment is a violation thereof.

We therefore affirm the district court's dismissal of Counts I and II of Plaintiffs' amended complaint to the extent that those counts relate to the timing of the vacancy election and the duration of appointed representation under the Seventeenth Amendment.

## II. First and Fourteenth Amendment *Burdick* Challenge to Vacancy Election Date

Plaintiffs raise their right to vote under the First and Fourteenth Amendments, as interpreted by *Burdick v. Takushi*, 504 U.S. 428 (1992), as an independent reason to find A.R.S. § 16-222 unconstitutional as applied to the November 2020 vacancy election date. *Burdick* prescribes a sliding-scale level of scrutiny for evaluating governmental actions that burden the right to vote. *Id.* at 434. At one end of the spectrum, "severe" restrictions must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). At the other end of the spectrum, "important [state] regulatory interests are generally sufficient" to justify "reasonable, nondiscriminatory restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). Thus, the burdening of the right to vote always triggers a higher level of scrutiny than rational basis review, but does not always trigger strict scrutiny.

The parties dispute the severity of the burden at issue here. Plaintiffs argue that a 27-month election "delay" is plainly a "severe" restriction on the right to vote. Defendants argue that the delay of a vacancy election until the next general election is not a burden at all. We assume, without deciding, that regulation of the timing of a vacancy

election is at least a "burden" for purposes of *Burdick* review. However, because we hold above that the Seventeenth Amendment authorizes at least as long of an interval before the vacancy election as is challenged here, we conclude that the burden thereby posed is necessarily a "reasonable" one.

"[R]easonable" restrictions on the right to vote may be justified by "important" state interests. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). Defendants assert three state interests. First, they note the cost of holding an election that takes place independently of the biennial general election. Plaintiffs counter that the cost is relatively small, but we have previously found similar interests "important" in other *Burdick* cases. *E.g.*, *Dudum v. Arntz*, 640 F.3d 1098, 1116 (9th Cir. 2011); *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 733 (9th Cir. 2015).

Second, Defendants argue that Arizona has an important interest in maximizing voter turnout, and provides evidence that voter turnout in recent Arizona elections was highest at biennial general elections. Plaintiffs counter that Defendants' evidence is inapposite because a special election for a Senator could have a much higher turnout than the special elections Defendants reference. Plaintiffs further argue that Defendants offer no basis for what increase in turnout qualifies as important, and that the indifference of some voters should not preclude others from voting. Despite these limitations, we agree that Arizona's interest in voter turnout is important.

Third, Defendants point to the possibility of voter confusion engendered by multiple elections. In 2020, Arizonans are scheduled to vote in a March presidential primary, an August primary, and the November general election. We agree that Arizona's interest in minimizing

voter confusion is important and relevant in this context.  We reject Plaintiffs' argument that *Soltysik v. Padilla*, 910 F.3d 438 (9th Cir. 2018), precludes the voter confusion rationale. *See id.* at 448–49 (holding that a speculative concern of voter confusion was insufficient, but also that elaborate empirical verification was unnecessary where the burden of a restriction is minimal).  In *Soltysik* we were considering the potential voter confusion engendered by candidate party affiliations on the ballot, a matter we found highly speculative.  In this case, the potential for voter confusion on account of multiple elections is not purely speculative but has been validated by other cases.  *See, e.g.*, *Lynch v. Ill. State Bd. of Elections*, 682 F.2d 93, 97 (7th Cir. 1982); *Vera v. Bush*, 933 F. Supp. 1341, 1348 (S.D. Tex. 1996) (three-judge court).

Relying on *Soltysik* more generally, Plaintiffs argue that all of Defendants' arguments fail at the motion to dismiss stage because an evidentiary hearing is necessary to apply something more than rational basis review.  *See* 910 F.3d at 446–48.  We disagree.  This case is distinguishable from *Soltysik* because, compared to the burden at issue here, the burden in *Soltysik* fell higher on the *Burdick* sliding scale between "reasonable, nondiscriminatory" and "severe."  *Id.* at 445–46.  In *Soltysik*, we considered a challenge to a California law requiring candidates from all but six "qualified" parties to state a party preference of "None" on the ballot.  *Id.* at 445.  The law therefore required a false statement regarding political views and clearly discriminated against candidates from new and small parties. *Id.* at 445–46.  Under these circumstances, we held that further development of the evidentiary record was necessary to determine whether there were "more precise ways" to address the State's alleged interest in preventing voter confusion.  *Id.* at 447.

We have already explained our conclusion that the burden posed by the timing of the vacancy election here is necessarily reasonable. To the extent that A.R.S. § 16-222(D)'s timing provision discriminates (against candidates other than the appointee, or parties other than that of the appointee, or voters who disfavor the appointee)—based on it providing the appointee ample time to gain the advantages of running as an incumbent—this discrimination is hardly distinguishable from that which occurs when a candidate wins an election by the people. *Cf. Rodriguez*, 457 U.S. at 12 (finding that the Puerto Rico vacancy statute's effect "d[id] not fall disproportionately on any discrete group of voters, candidates, or political parties"). Thus, a higher level of scrutiny applied to the discriminatory regulation in *Soltysik* than applies here, and justified holding an evidentiary hearing to properly scrutinize the burden.

Plaintiffs have failed to plausibly allege that the timing of the vacancy election here is not justified by "important" state interests. *Burdick*, 504 U.S. at 434; *cf. Rodriguez*, 457 U.S. at 12 (finding that the Puerto Rico vacancy statute "plainly serve[d] the legitimate purpose of ensuring that vacancies are filled promptly, without the necessity of the expense and inconvenience of a special election"). Given that the burden of this timing on Plaintiffs' right to vote is "reasonable" and "nondiscriminatory," the "important" state interests raised above are sufficient to affirm the dismissal of Plaintiffs' First and Fourteenth Amendment challenges. *Id.*

We therefore affirm the district court's dismissal of Count I in its entirety.

### III.   Constitutional Challenges to Appointment Mandate and Same-Party Restriction

Apart from the timing required by A.R.S. § 16-222(D), Plaintiffs challenge the law in two additional respects. They challenge the law's mandate that "the governor *shall* appoint a person to fill the vacancy," *id.* § 16-222(C) (emphasis added), as a violation of the Seventeenth Amendment's instruction that a state legislature "may *empower*" the Governor to make temporary appointments, U.S. Const. amend. XVII (emphasis added). They also challenge the law's further mandate that the "appointee shall be of the same political party as the person vacating the office," A.R.S. § 16-222(C), as a violation of the Qualifications Clauses as interpreted by *U.S. Term Limits*, 514 U.S. at 787–827. Defendants argue that the first challenge fails on the merits, and that the second fails for lack of standing. The district court agreed. We conclude, however, that Plaintiffs lack standing to raise either challenge.

The jurisdiction of Article III courts is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–47 (2016). In order to establish that they have the "irreducible constitutional minimum" of standing to bring a case or controversy, Plaintiffs have the burden of demonstrating that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). We focus here on the second factor.

Plaintiffs invoke numerous theories to describe the injuries they allegedly suffer on account of § 16-222(C)'s mandate that the Governor make a temporary appointment and choose a member of the same political party as the

Senator who created the vacancy. *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 742–45 (1995) (representational harm); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (loss of opportunity to compete); *Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (imposition of state viewpoint); *Daniels v. Williams*, 474 U.S. 327, 339 (1986) (Stevens, J., concurring in the judgment) (fundamentally flawed procedure). Even assuming Plaintiffs have suffered an injury in one or more of these respects, we fail to see how such an injury is traceable to A.R.S. § 16-222(C).

Given that Arizona's legislature "empower[ed]" the state governor to make "temporary" appointments, U.S. Const. amend. XVII, Governor Ducey unquestionably had the authority to appoint Martha McSally as a temporary replacement for Senator McCain. Plaintiffs allege no facts rebutting Governor Ducey's statement on appeal that he "would have appointed Senator McSally regardless of the requirement that he name an interim senator and regardless of the requirement that the appointee share Senator McCain's political party." Accordingly, Plaintiffs have suffered no injuries from the appointment of Senator McSally that are fairly traceable to § 16-222(C), and have suffered no injury attributable to the mere existence of § 16-222(C) since it has not affected them. This lack of traceability is fatal to standing. Thus, we need not resolve whether the district court could redress Plaintiffs' alleged injuries in the counterfactual where they were traceable to § 16-222(C).

Accordingly, we affirm the district court's dismissal of Count II of Plaintiffs' amended complaint as it relates to the appointment mandate, and of Count III in its entirety, for lack of standing.

## CONCLUSION

We interpret the Seventeenth Amendment, in light of *Valenti* and *Rodriguez*, to confer at least as much temporal discretion upon the States as was exercised by Arizona in A.R.S. § 16-222 as applied to the vacancy created by Senator McCain's death. Given this authorization by the Seventeenth Amendment, we further conclude that the vacancy election timing challenged here does not impermissibly burden the right to vote under the First and Fourteenth Amendments. We lack jurisdiction to consider Plaintiffs' additional challenges.

**AFFIRMED.**

COLLINS, Circuit Judge, concurring in part and concurring in the judgment:

I agree with the majority that the district court properly dismissed Plaintiffs' various constitutional challenges to the Arizona statute governing the filling of senatorial vacancies, but in my view the issues raised in this case can be readily resolved under existing precedent. I therefore do not join the lengthy excursus on the meaning of the Seventeenth Amendment in section I(A) of the "Analysis" section of the majority's opinion, which seems to me unnecessary to our decision in this case. Instead, I join only Parts I(B), II, and III of the "Analysis" section, and I concur in the judgment.

# I

The Seventeenth Amendment expressly authorizes the legislature of a state to "empower the executive," in the event of a vacancy in that State's representation in the United

States Senate, "to make temporary appointments until the people fill the vacancies by election as the legislature may direct." U.S. Const. amend. XVII, para. 2. Arizona's legislature has authorized the state Governor to make such temporary appointments, *see* Ariz. Rev. Stat. § 16-222(C), and after the vacancy created by the death of Senator John McCain, the Governor (Defendant Doug Ducey) exercised that authority by first appointing Jon Kyl and then, after Kyl's resignation, by appointing Defendant Martha McSally. Under the plain terms of the amendment, McSally therefore may continue to serve temporarily "until the people" of Arizona "fill the vacanc[y] by election *as the legislature may direct*." U.S. Const. amend. XVII, para. 2 (emphasis added). On its face, the italicized phrase unquestionably grants the Arizona legislature "*some* reasonable degree of discretion" in setting the date of the election that will fill this Senate vacancy and thereby terminate McSally's current "temporary appointment[]." *Valenti v. Rockefeller*, 292 F. Supp. 851, 856 (W.D.N.Y. 1968) (three-judge district court) (emphasis added), *summarily aff'd*, 393 U.S. 405 (1969); *see also* 292 F. Supp. at 884 (Frankel, J., dissenting) (agreeing that it was "acceptabl[e] all around" to "speak of a 'reasonable discretion' left to the state legislatures"). The Seventeenth Amendment question presented here is whether, by fixing the date of that election as November 3, 2020—*i.e.*, more than 26 months after Senator McCain's death on August 25, 2018—the Arizona legislature has transgressed the proper boundaries of the discretion conferred by that amendment. *See* Ariz. Rev. Stat. § 16-222(D) (providing that where, as here, a vacancy occurs 150 days or fewer "before the next regular primary election date, the person who is appointed shall serve until the vacancy is filled at the *second* regular general election held after the vacancy occurs") (emphasis added).

The answer to this question is dictated by the precedential effect of the Supreme Court's summary affirmance in *Valenti*, particularly as construed by the Court's subsequent decision in *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10–11 (1982). The three-judge district court in *Valenti* rejected a similar Seventeenth Amendment challenge to New York's 29-month delay in the election to fill the vacancy created by the assassination of Senator Robert F. Kennedy in 1968, and the Supreme Court's affirmance of that decision—coupled with *Rodriguez*'s subsequent discussion of that affirmance—leaves no doubt that we must reject Plaintiffs' Seventeenth Amendment claim here.

In *Valenti*, a three-judge district court rejected the plaintiffs' constitutional challenges to a New York statute that effectively set November 3, 1970 as the date of the election to fill the vacancy created by Senator Kennedy's death on June 6, 1968. *See* 292 F. Supp. at 853.[1] After rejecting the plaintiffs' contention "that an election *in 1968* is constitutionally required," the court concluded that it "must also answer another question: Does the Seventeenth

---

[1] *Valenti* actually involved three separate actions, two of which were filed in the Southern District of New York (*Phillips v. Rockefeller* and *Backer v. Rockefeller*) and one of which was filed in the Western District of New York (*Valenti*). The three actions apparently were not consolidated. Instead, to "facilitate prompt disposition of the common question, identical three-judge courts were designated in each case" by assembling a panel consisting of a Second Circuit judge and a district judge from each of the two districts involved. 292 F. Supp. at 854. The cases were argued together, *see id.*, and "[d]uplicate originals" of the resulting opinion were filed in each district, *id.* at 868. The plaintiffs in each case separately appealed to the Supreme Court, which separately affirmed each judgment without opinion. *See Phillips v. Rockefeller*, 393 U.S. 406 (1969); *Valenti*, 393 U.S. at 405; *Backer v. Rockefeller*, 393 U.S. 404 (1969).

Amendment prohibit New York from bypassing its general election *in 1969* in favor of filling the vacancy in November, 1970?" *Id*. at 855 (emphasis added). After an extensive analysis, the court answered this question in the negative and concluded that the New York legislature had "not contravene[d] the powers" conferred on it by the Seventeenth Amendment, even though "in the tragic circumstances of Senator Kennedy's death the statutory chronology results in a delay of 29 months before the election of his successor by the people." *Id*. at 867–68.

The Supreme Court summarily affirmed without opinion. *See* 393 U.S. at 404–06. As the majority recognizes, *see* Majority Opinion at 45, we are bound by the result, if not the precise reasoning, when the Supreme Court summarily affirms a judgment. *See Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 224 n.2 (1992) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983)). And because the 26-month delay at issue here is *shorter* than the 29-month delay upheld against a Seventeenth Amendment challenge in *Valenti*, we are bound under *Valenti* to reject Plaintiffs' challenge here.

Plaintiffs seek to evade *Valenti* by arguing that the "specific relief" sought in the complaints in those cases was "an election in November 1968 *only* and at no other time"; that "all the summary affirmance necessarily did was to deny an election on that date"; and that the Court therefore did not "necessarily uph[o]ld a 29-month delay in filling a Senate vacancy." This contention fails. As an initial matter, Plaintiffs' narrow characterization of the constitutional challenges presented in *Valenti* is belied by the district court opinion, which expressly addressed both the plaintiff's "main argument" for a 1968 election date *and* their alternative argument for a 1969 election date. 292 F. Supp.

at 855.  Thus, while we are not bound by the *Valenti* district court's *reasoning* in upholding a 29-month delay until the second subsequent congressional election, there can be no doubt that the district court's *judgment* included a rejection of a Seventeenth Amendment challenge to such a delay, and we are bound by the precedential effect of the Supreme Court's summary affirmance of that judgment.  *Anderson*, 460 U.S. at 784 n.5 ("[T]he precedential effect of a summary affirmance extends no further than 'the precise issues presented and necessarily decided by those actions.'").

Moreover, as the Supreme Court has explained, "[s]ummary affirmances . . . without doubt reject the specific challenges *presented in the statement of jurisdiction* and do leave undisturbed the judgment appealed from."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (emphasis added).[2]  The first question presented in the jurisdictional statement filed in the Supreme Court in the *Phillips* case was as follows:

> Did New York State's Legislature in enacting Section 296 of the Election Law violate Amendment XVII to the Constitution of the United States by vesting in the Executive *the power to make a 29 months "temporary appointment"* (from June 7, 1968 to December 1, 1970) and by vesting in "the people" (8,000,000 registered voters) the

_____

[2] Then, as now, the Supreme Court's rules required that, in cases appealed as of right to the Court, the appellants must file a "jurisdictional statement" setting forth, *inter alia*, the questions presented and the basis for invoking the Court's appellate jurisdiction.  *See* S. CT. R. 15 (1967 ed.); *cf.* S. CT. R. 18.3 (2019 ed.) (retaining a comparable requirement for the much smaller class of cases that remain within the Court's mandatory appellate jurisdiction today).

> right to elect a Senator of their own choosing
> for only 1 month (December 1, 1970 to
> January 3, 1971) where the total unexpired
> term of the late Senator Robert F. Kennedy
> was 30 months?

Jurisdictional Statement, *Phillips v. Rockefeller*, 393 U.S. 406 (1969) (No. 854), 1968 WL 129208, at *4–5 (emphasis added); *see also id*. at *6 ("[A] judgment by this Court reversing the judgment below would make possible an election for the Senate seat at the November, 1969 election. Or at an earlier special election by order of this Court."). Similarly, the jurisdictional statement in the *Backer* case challenged the district court's upholding of the November 1970 date over a November 1969 date. *See* Statement as to Jurisdiction, *Backer v. Rockefeller*, 393 U.S. 404 (1969) (No. 852), 1968 WL 112484, at *10 ("The lower court explicitly decided . . . the question: Does the Seventeenth Amendment prohibit New York from bypassing its general election in 1969 in favor of filling the vacancy in November, 1970? The question was answered in the negative."). By separately and summarily affirming the judgments in *Phillips* and *Backer*, *see* 393 U.S. at 404, 406, the Supreme Court "without doubt reject[ed] the[se] specific challenges presented in the statement of jurisdiction," and the Court therefore *necessarily* rejected these plaintiffs' challenges to the 29-month delay. *Mandel*, 432 U.S. at 176. We are bound by that holding, which requires us to reject Plaintiffs' Seventeenth Amendment challenge here.

In addition, as the majority correctly notes, *see* Majority Opinion at 48, the Supreme Court's subsequent decision in *Rodriguez* further confirms that Plaintiffs' narrow reading of *Valenti* is incorrect. In *Rodriguez*, the Court addressed a constitutional challenge to Puerto Rico's system for filling

vacancies in its commonwealth legislature through temporary appointments lasting "only until the next regularly scheduled election."  457 U.S. at 7; *see also id*. at 8–12.**[3]**  The challengers contended that "qualified electors have an absolute constitutional right to vote for the members of a state or commonwealth legislature, even when a special election is required for this purpose."  *Id*. at 8–9.  In rejecting this contention, the Court drew an analogy to its summary affirmance in *Valenti*.  Summarizing that ruling, the Court in *Rodriguez* did not refer to *Valenti* as addressing only a claim that the vacancy election had to be held within five months.  Rather, the Court explained that *Valenti* had "sustained the authority of the Governor of New York to fill a vacancy in the United States Senate by appointment pending the next regularly scheduled congressional election—in that case, *a period of over 29 months*."  457 U.S. at 10–11 (emphasis added).  The Court reasoned that the *Rodriguez* challengers' insistence on a constitutional right to a special election (*i.e.*, an election in advance of the next regularly scheduled legislative election in Puerto Rico) was hard to square with *Valenti*: "[T]he fact that the Seventeenth Amendment permits a state, if it chooses, to forgo a special election in favor of a temporary appointment to the United States Senate suggests that a state is not constitutionally prohibited from exercising similar latitude with regard to vacancies in its own legislature.  We discern nothing in the Federal Constitution that imposes greater constraints on the Commonwealth of Puerto Rico."  *Id.* at 11.  *Rodriguez*'s discussion of *Valenti* confirms that the Court understood its

---

**[3]** In *Rodriguez*, a person elected to the Puerto Rico House of Representatives died shortly after the election, *see* 457 U.S. at 3, and the vacancy was ultimately filled by a member of the same political party who was designated after "a primary election in which only [that party's] members were permitted to participate," *id*. at 5 n.3.

summary affirmance as rejecting a Seventeenth Amendment challenge to New York's 29-month delay until the next regularly scheduled election that would allow sufficient lead time for a primary election.

I therefore agree with the majority's conclusion that, because Arizona's delay of the vacancy-filling election "does not exceed" the delay "endorsed by *Valenti* and *Rodriguez*," the "timing provision of A.R.S. § 16-222(D) as applied to the McCain vacancy is a permissible exercise of the State's discretion under the Seventeenth Amendment." *See* Majority Opinion at 53--54.  I thus concur in Part I(B) of the "Analysis" section of the court's opinion and concur in its judgment rejecting Plaintiffs' Seventeenth Amendment challenge.

## II

I agree with the court's rejection of Plaintiffs' First and Fourteenth Amendment challenges to the date of the vacancy-filling election, and I therefore concur in Part II of the court's "Analysis" section.  Indeed, Plaintiffs' arguments on this score seem difficult to square with *Rodriguez*'s observation that Puerto Rico's "choice to fill legislative vacancies by appointment rather than by a full-scale special election may have some effect on the right of its citizens to elect the members of the Puerto Rico Legislature; however, *the effect is minimal*, and like that in *Valenti*, it does not fall disproportionately on any discrete group of voters, candidates, or political parties."  457 U.S. at 12 (emphasis added).

## III

Lastly, I agree with the court that Plaintiffs lack standing to challenge the requirements in Arizona law that (1) the

Governor *must* make an appointment, and (2) the person
selected must be from the same political party as the person
who vacated the office.  As the court explains, Plaintiffs
cannot fairly trace their asserted injuries to these statutory
provisions, as opposed to the Governor's independent
decisions.  I therefore join Part III of the court's "Analysis"
section.  For similar reasons, I believe that Plaintiffs also fail
the redressability prong of standing.  *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 561 (1992).  Given that Governor
Ducey has stated that he would have appointed McSally
regardless of these statutory constraints, *see* Majority
Opinion at 59, any judgment invalidating those constraints
would not redress *these* Plaintiffs' alleged injuries.

*        *        *

    For the foregoing reasons, I join Parts I(B), II, and III of
the court's "Analysis" section, and I concur in the court's
judgment affirming the district court's dismissal of this
action.